# Richmond

## COUNTY OF FAIRFAX V. CITY OF ALEXANDRIA.

December 3, 1951.

Record No. 3867.

Present, All the Justices.

The opinion states the case.

*Robert J. McCandlish, Jr.* and *Hugh B. Marsh,* for the appellant.

*Horace H. Edwards, V. Floyd Williams, Armistead L. Boothe* and *William W. Koontz,* for the appellees.

HUDGINS, C. J., delivered the opinion of the court.

The county of Fairfax obtained this appeal from an order entered by a three-judge court, composed of Walter T. McCarthy,

judge of the Thirty-fifth Judicial Circuit, Jeff F. Walter, judge of the Thirty-first Judicial Circuit, and Paul E. Brown, resident judge. The order annexed to the city of Alexandria that part of the territory of Fairfax county described therein, defined the terms and conditions of annexation, and required the city to assume that proportion of the existing indebtedness of the county, and its subdivisions, that the court deemed fair and just.

Five hundred and seventy citizens, or freeholders, living, or having an interest, in the territory proposed to be annexed, opposed the annexation, and were made parties defendant. Ninety-one other parties, similarly situated, favored annexation and, on request, were made parties. None of the parties opposing annexation joined the county in the appeal. All those favoring annexation filed a brief in support of the final decree.

The record (comprising 748 printed pages, 116 exhibits, consisting of maps, tables, charts, and numerous pages of type-written and printed matter) is so voluminous that only that part of the evidence pertinent to the contentions of the parties will be discussed.

The main questions raised by the sixteen assignments of error are: (1) whether the evidence sustains the court's finding that the annexation of the territory was necessary and expedient; (2) whether the conditions imposed upon the city for the future management and improvement of the territory were reasonable and fair; (3) whether the court had authority to annex a part of a sanitary district; and (4) whether the court required the city to assume a fair and just proportion of the existing indebtedness of the county and its political subdivisions.

Section 2958 of the Code of 1919 (Sec. 15-135 of the Code of 1950), requiring an annexation court to ascertain and determine the question of necessity for and expediency of annexation, was amended in 1948. (Acts 1948, p. 589) This amendment enumerates the elements to be considered by the court in ascertaining and determining the necessity for and expediency of annexation by use of the following italicized language:

"Such court * * * shall ascertain and determine the necessity for and expediency of annexation, (1) *considering the best interests of the county*, (2) *the city* * * * (3) *services to be rendered and the needs of the area proposed to be annexed and* (4) *the best* interest of the remaining portion of the county * * *."

The four elements to be considered in this case are: (1) the

city of Alexandria; (2) the area to be annexed; (3) the county of Fairfax before, and after, annexation; and (4) the needs of the respective areas and the proposed governmental services to be rendered.

Alexandria is an old and historic city. Its corporate limits were last extended in 1930, which gave it an area of 7-1/3 square miles, and a population of 24,159. The population in 1940 was 33,523, and in 1950 61,601, an increase of 83% in the last ten years. There are few vacant lots suitable for industrial or residential sites in the present corporate limits. Studies made by the Harvard University show that there is only half as much vacant space in Alexandria as is in comparable American cities.

The rate of taxation in the city is reasonable. The finances of the city are well managed. It is so organized and managed that it furnishes all the normal and modern governmental services and benefits usually furnished by a well organized, modern urban community. . These services include a scientific master plan for the grading of streets, sidewalks, zoning, construction and maintenance of public buildings, parks and recreational centers. The city has a modern public school system, including adequate and commodious buildings and equipment, and a full corps of well qualified instructors in the various departments of the schools; a modern, scientific department of health, adequate police and fire protection, and it makes proper provision for the lighting of streets, maintenance of sewers and removal of garbage and trash.

On May 10, 1950, the board of supervisors of Fairfax county issued an official statement concerning the sale of $3,000,000 of sewer bonds for Sanitary District No. 1, in which the county is thus described: "The County's 417 square miles in area are in large part devoted to agricultural pursuits, with dairy farming being the principal activity. There is, however, a large portion of the County which is a strictly residential suburb of the Washington Metropolitan area. The primary source of employment for the population is the Federal Government in Washington, D. C., although some employment is afforded in the nearby communities of the County of Arlington and the City of Alexandria."

The increase of population in the county is comparable to that of Alexandria. In 1930 its population was 25,264; in 1940 40,929,

and in 1950 105,722. The estimated assessed value of its taxable property for the year 1950 was $77,000,000.

The form of government of the county is similar to that prevailing in most of the counties in the Commonwealth. It is adequate to meet the normal needs of a rural community.

While the county introduced evidence tending to show that it furnished its inhabitants with some of the governmental services furnished by Alexandria to its inhabitants, a comparison of the services furnished by the county with those furnished by the city shows that the services provided by the city are far superior to those provided by the county.

The territory proposed to be annexed comprises approximately 7.65 square miles. It has 11,000 inhabitants, most of whom moved within the area during the two years next preceding the institution of this suit. Only 7% of the area (or 343 acres of the 4896 acres in the area) is subdivided. In the area there are 540 separate dwellings and 2447 apartment units, making a total of 2987 dwelling units. The other part of the area is undeveloped and to a large extent unoccupied, but is well adapted for use as business or residential sites.

The existing subdivisions were not made with any plan of developing the whole territory. The different owners subdivided their lands into lots without regard to an over-all plan for the entire area. The result is that there is no uniform grading of streets, many of which do not form connecting links with other streets or highways. The county has no master plan for developing this area. It does not propose to grade, build or light the streets and sidewalks in the area.

If and when the area is annexed the remaining portion of the county will contain approximately 409.35 square miles, a population of approximately 94,000, and approximately $72,238,000 of taxable property values.

The county contends that the evidence is insufficient to sustain the finding of the court that annexation is necessary and expedient. This contention is based on three main grounds: (1) the area proposed to be annexed, as well as the city of Alexandria, the counties of Arlington and Fairfax, is a part of the metropolitan area of the District of Columbia, and not a part of the metropolitan area of Alexandria; (2) there is no community of interest between the area sought to be annexed and Alexandria; (3) most of the area sought to be annexed is undeveloped.

It is true that the two named counties and the city are a

part of the large metropolitan area of the District of Columbia. This is true of a part of the State of Maryland and other parts of Virginia. The enormous, almost feverish, increase in the activities of the Federal government in and around Washington has resulted in the growth and development of the area within the District of Columbia as well as the areas adjacent thereto. To meet the problems presented by the enormous increase in population in these areas, Congress has appropriated various sums to aid in public education, including the construction of school buildings. Both Alexandria and Fairfax have received their proportionate shares of the sums so appropriated.

The Congress and the General Assembly of Virginia, as well as other departments of both the State and the Federal governments, have assisted the respective localities in solving some of the difficult problems presented by this unprecedented increase in population. These facts are not controlling upon the court in ascertaining and determining the necessity for and expediency of annexation.

The area sought to be annexed is in the direction that the city has grown since its last annexation in 1930. Both the city and the area are affected by the impact of the metropolitan urbanization. As heretofore stated, more than 11,000 people have moved into the area in the last two years. Numerous buildings are being constructed, and many others contemplated, to accommodate the increasing demands for business houses and dwelling units. Many occupants of the area work in Washington, but they have become citizens, or residents, of Virginia, and as such are compelled to share in the responsibilities imposed by the laws of the Commonwealth, and are entitled to share in the benefits to be derived, whether such benefits are derived from the laws of a rural or urban community.

The overflow of population into the area proposed to be annexed is due, in a large measure, to the activities centered in and around Washington; hence the community of interest between the area and the city is not so close as is usually the case between a city and the territory adjacent thereto. However, the evidence proves that there is a substantial community of interest existing between the area and the city. It discloses that more than 30% of the people living in the area work or have their places of business in Alexandria. Many social, religious and business ties exist between those living in the city and those

living in the proposed area. A large per cent of the people in the area do their shopping in the city, attend churches, theaters and other recreational centers, and patronize the hospitals. They use the city streets and sidewalks, and send their children to private and public schools in the city.

Mr. Justice Whittle, in an opinion announced at this session of the court, in *Falls Church* v. *Board of Sup'rs, post,* p. 112, 68 S. E. (2d) 96, said:

"Aside from what the printed record discloses the annexation court, composed of able, experienced trial judges, heard the evidence *ore tenus,* they visited and studied the areas under consideration, saw the physical properties under the control of the city—the streets, the schools, the library, the jail, the fire-fighting equipment, and had an opportunity to observe and study the various other services allegedly furnished by the present municipal government. The court then observed and studied the character of services which the citizens in the area sought to be annexed were receiving from the county of Fairfax, and thus had opportunities for observation and study which are not afforded us.

"We stated in *County of Norfolk* v. *Portsmouth,* 124 Va. 639, 98 S. E. 755: 'And the statute law on the subject having made special and eminently fair and just provisions for the constitution of the trial courts, and such courts having peculiar opportunities to ascertain the very right of the case, by a view of the *locus in quo,* and by the examination of witnesses in the presence of the court, their conclusions and decisions on matters of fact are not to be disturbed unless plainly wrong * * *.' "

On the record in that case we applied the foregoing principles and affirmed the unanimous decision of the annexation court, refusing to annex any territory to the city of Falls Church, on the ground that the city failed to prove the necessity for and expediency of annexation. Paul E. Brown sat as resident judge in the Falls Church case and also in the case now under consideration. In the present case he concurred in the unanimous decision of the annexation court holding that Alexandria proved the necessity for and expediency of annexation. The evidence in the two cases is different, but the same principles of law are applicable to both. In one case annexation is denied and in the other it is allowed.

The county concentrated most of its argument on the con-

tention that an annexation court has no authority to include a part of a sanitary district in an area proposed to be annexed to a city.

In 1943 Fairfax county took the proper steps to form Sanitary District No. 1, bounded by the city of Falls Church, the county of Arlington and the city of Alexandria, embracing a thirty square mile area of the county. $3,000,000 of bonds were issued to improve sanitation in this district.

It is argued that the 1948 amendment (Acts 1948, Ch. 465, p. 915) to Chapter 161 of the Acts of 1926, providing that a court shall not reduce the size of a sanitary district after bonds have been issued, must be construed as a part of the annexation statutes, and that an annexation court, under no circumstances, can annex a part of a sanitary district to a municipality.

The pertinent provisions of the amendment are italicized in the following excerpt from the statute:

"Section 2-a. The circuit court, or the judge of such court in vacation, upon the petition of the board of supervisors or other governing body of the county and twenty-five percentum of the qualified voters residing within the limits of the territory proposed to be added or severed, may make an order altering the boundaries of and enlarging or reducing any sanitary district created under the provisions of this act, which order shall prescribe the metes and bounds of the territory to be added or severed; *provided, however, that no order reducing a sanitary district and severing any territory therefrom shall be made if any bonds of the sanitary district have theretofore been issued and have not been redeemed in full as of the date of the petition requesting such reduction of the sanitary district, or if any system or systems have been established and are in operation under the provisions of section three of this act, as amended, in the territory proposed to be severed as of the date of the petition requesting such reduction of the sanitary district.*"

This argument requires consideration of the contemplated purposes of the annexation statute and the sanitary district statutes.

Prior to the adoption of the Constitution of 1902, the extension of corporate limits of cities and towns was a legislative function. Section 126 of the Constitution directs the General Assembly to provide "by general laws for the extension and contraction, from time to time, of the corporate limits of cities and towns; and no special act for such purpose shall be valid."

Pursuant to this authority the General Assembly of 1904 (Acts 1904, Ch. 99, p. 144) adopted the first statute providing for the extension of corporate limits of cities and towns. This act, in part, read: "* * * whenever it is deemed desirable, by any city or town to *annex any territory* to such city or town, its council shall declare by ordinance * * * that it desires to annex certain territory * * *." (Italics supplied)

The annexation statute, as the act is commonly called, has been amended from time to time. The quoted provision of the Act of 1904 is now a part of section 15-125 of the 1950 Code. Section 15-126 of the Code authorizes the inhabitants of "any outlying territory" adjacent to a town or city to institute proceedings to have such territory annexed to a municipality. The phrases "any territory," and "any outlying territory" are broad and inclusive. However, the statute does, in express terms, exclude from annexation: (1) territory which is not a reasonably compact body of land; (2) territory that is not adapted to city improvements, or which the city will not need in the reasonably near future for development (Code, sec. 15-135), and (3) territory of any national soldiers' home for disabled volunteer soldiers. (Code, sec. 15-146.) The annexation statutes contain no other limitation or restriction upon the territory that may be annexed to a municipality.

In *Nexsen* v. *Board of Sup'rs,* 142 Va. 313, 128 S. E. 570, the phrase "any outlying territory" was construed to include an incorporated town within the area proposed to be annexed. In determining the question, we said:

"It is urged, however, that the words 'outlying territory adjacent to a town or city' should not be construed to include an incorporated town * * *.

"In considering the question it must be borne in mind that in Virginia an incorporated town continues to be an integral part of the county, subject to the jurisdiction of the county authorities and to taxation for general county purposes. It is also observed that there is nothing in the section distinguishing the kind of territory which may be annexed, the designation being 'outlying territory' which is adjacent. If we limit the meaning of the outlying territory to outlying unincorporated territory, which is not included within the boundaries of a town, it can only be done by conceiving and supplying to the section a limitation which cannot be found in the language used. * * *"

■ There is nothing in the annexation statutes that can be construed to exclude a sanitary district, or any part thereof, from the area to be annexed. There is no logical reason for taking the statutory provision which is pertinent to the creation and regulation of a sanitary district and, by a strained construction, making it a part of the statutes dealing with annexation.

■ The sanitary district statutes merely provide for the creation, regulation and maintenance of sanitary districts, and authorize the judge of the circuit court of the county in which the district is to be formed to enter all orders upon the terms and conditions set forth in the statutes. By the 1948 amendment of the statutes the judge of a circuit court is prohibited from entering an order reducing the size of a sanitary district after the issue and sale of sanitary district bonds. The obvious legislative intent in prohibiting the reduction of a sanitary district after bonds have been issued was to prevent impairment of the security for the payment of the outstanding bonds. The sanitary statutes make no other provision for the protection of bondholders. The circuit court is not authorized to make any substitution or otherwise protect those who have bought bonds upon the faith of property values within a sanitary district.

The annexation statutes provide for the formation of a court to be composed of three judges to determine whether it is necessary and expedient to add any territory of a county to a municipality. Such court, in ordering the territory to be annexed, is required to protect the creditors of such county, or any of its political sub-divisions by compelling the annexing city to assume a just proportion of any existing indebtedness. The annexation court required the city of Alexandria to assume a just proportion of the existing indebtedness of Sanitary District No. 1. Hence, the security, upon the faith and credit of which the sanitary bonds were issued, has not been impaired by including a portion of Sanitary District No. 1 in the territory annexed to the city.

The 1948 amendment to the sanitary district statutes is codified under Title 21 of the 1950 Code, dealing with the creation, drainage, soil conservation and sanitation of public facilities districts. Neither the title to nor the provisions of the statutes are pertinent or germane to the annexation laws which are codified under Title 15 of the 1950 Code. In the sanitary dis-

trict statutes there is no reference to the statutes dealing with annexation of territory to municipalities, nor is there any reference in the annexation statutes to the sanitary district statutes. The statutes are not in conflict.

It is a well settled canon of construction that full force and effect must be given to every provision of statutory law. Before an existing statute may be held to be repealed or inoperative, it must clearly appear that the statute last adopted is in conflict with the former statute and that the two are so inconsistent that both cannot be enforced. Repeal of a statute by implication is not favored. The apparent inconsistencies must be reconciled if possible. *Nexsen* v. *Board of Sup'rs, supra.*

If it be held that the 1948 amendment to the sanitary district statutes applies to the annexation laws of the Commonwealth, then the legislature has placed counties in a position to prohibit the further expansion and growth of cities, as it would be comparatively easy for any county so to form a sanitary district adjacent to a city that annexation would be impracticable, if not impossible.

It is inconceivable that the General Assembly, by a mere amendment pertinent and germane to the sanitary laws, intended to make such a radical change in the annexation laws. It is reasonable to assume if such a change had been contemplated it would have been effected by clear and unambiguous language in a separate statute, or in an amendment to the annexation statutes. A change so far-reaching in effect should not be accomplished by mere implication.

A similar question was raised in *Henrico* v. *Richmond,* 177 Va. 754, 15 S. E. (2d) 309, where it was argued that since the county of Henrico had adopted the "County Manager Form" of government in accordance with the Act of 1932, it was entitled to the benefit of Section 2773-1 of the Acts of 1930 (Code 1950, sec. 15-358) which, in effect, provides that where a county has adopted the County Manager Form of government, no part of its territory can be annexed by a city unless the whole county be annexed. This argument was rejected and it was held that the section in question applied only to Arlington county. In passing upon this question, Mr. Justice Eggleston, speaking for the court, said at p. 778:

"Suppose all of the counties in the State should adopt one of the prescribed forms of government under the 1932 Act, could

the General Assembly have intended that when all cities in the State would be frozen in their limits and denied the right of expansion by reason of the imposition of terms impossible to be performed?

        *    *    *    *    *    *

"But this question we do not have to decide, for it is inconceivable to us that the General Assembly would have effected so radical a change in its settled policy of annexation by mere implication—by placing these two acts in the same chapter of the Code and thereby incorporating by inference into the 1932 Act this restriction found in the 1930 Act and concededly designed to apply to the situation in Arlington County alone.

"The logical and reasonable place to find an indication of such a radical change in the legislative policy would, of course, be in an appropriate amendment to the annexation statutes themselves. * * * There no such change is indicated."

The county's next contention is that the method adopted by the annexation court in determining the just proportion of the $3,000,000 debt of the sanitary district that it ordered the city to assume was unfair to the county and the district. On the other hand, the city contends that the court required it to pay more than its just proportion of this indebtedness.

It is conceded that the revenues with which to pay the indebtedness of the sanitary district would be derived from two sources—75% from service charges collected from the users of the sewer system, and 25% from taxation. The district estimated that by 1950 there would be 6,765 residential connections; in 1970 13,912, and in 1980 a total of 14,501 connections. The number of connections and revenues derived from service charges at the time of the trial far exceeded the district's estimate. In 1950 11,231 connections had been made, 4,466 more than estimated. It was contemplated that a certain percentage of all revenues collected from the district would be set aside as a surplus fund.

The city contends that the revenues received under the financial plan will not only pay the principal, interest and carrying charges, but by 1980, the surplus, after discharge of all indebtedness, will be $2,451,657, and that the bonds should be liquidated from revenues from service charges without the necessity for the imposition of a tax.

The county contends that the testimony upon which the city

relies does not take into consideration the cost of maintenance and depreciation and that the city ought to bear annually through the years a just proportion of the obligation and share proportionately in any accumulated surplus.

■ The annexation court held that since the city was annexing 15% of Sanitary District No. 1, it should assume 15% of the existing indebtedness for which the district is liable. 15% of $3,000,000 is $450,000. However, the court held that the following unexpended sums should be deducted from that part of the debt required to be assumed by the city:

Expenditures proposed to be made in the
    area annexed (not now necessary) ...... $219,000
Expenditures proposed in the area to be
    financed by future revenues, or bond is-
    sue (not now necessary) .............. $10,000
Revenues collected from 2,224 connections
    in area at $10.47 each for a period of two
    years ........................... $46,570.56

Under this formula the net amount that the court required the city to assume was $174,429.44.

After the court had adopted the formula and made the above calculations, a slight reduction was made in the area to be annexed, thus reducing the amount to be paid by the city to $172,256.80.

While neither party was satisfied with the formula adopted by the court, or the amount it required the city to assume, the evidence supports the adjudication.

The ordinance providing for the annexation of the area therein described was adopted by Alexandria on March 22, 1950. The petition praying for annexation, with a copy of the ordinance attached, was filed on April 13, 1950. On May 31, 1950, in a referendum the voters of the county approved a bond issue of $980,000 for the erection of a new courthouse. On June 6, 1950, the circuit court of Fairfax county approved the returns and directed the board of supervisors to carry out the wishes of the voters and issue the bonds. At the time the final decree was entered none of these proposed bonds had been executed, sold or delivered.

The county contends that the issue and sale of the bonds is a ministerial duty which the board of supervisors may be com-

pelled to perform at any time, and hence $980,000, the amount of the proposed issue, is an existing debt of the county, and that the city should be required to assume a just proportion thereof.

The statute (Sec. 15-127) provides that the annexing city "shall assume and provide for the reimbursement of the county * * * for a just proportion of any existing debt of such county * * * or districts therein * * *." (Italics supplied)

" * * * Bonds are issued, not when they are authorized or executed, but when they are delivered, that is, when the possession and control thereof pass from the municipality to the donee or purchaser or some person in whose hands they become a claim or charge against the municipality; even though executed, the bonds do not become operative and obligatory unless and until they are delivered." 64 C.J.S., Municipal Corporations, Sec. 1948, p. 582.

In *Zimmerman* v. *New Martinsville,* 117 W. Va. 752, 188 S. E. 124, 109 A. L. R. 958, it is said: "* * * A bond speaks from the date of its delivery, which is one of the indispensable elements for putting it into effect. The authorization of the bond issue creates no contractual obligation. * * * In this case the town of New Martinsville had delivered none of the $64,000 additional bonds prior to the adoption of the Tax Limitation Amendment. The town had received no consideration for the bonds, and hence owed no indebtedness that they represented * * *."

Since the bonds for the construction of the courthouse had not been issued and delivered, the county had incurred no obligation therefor. The board of supervisors may, or may not, sell and deliver the bonds. Until these steps have been taken the county has incurred no obligation. An authorized issue of bonds does not constitute an "existing debt" within the intendment of the statute.

Our conclusion is that there is substantial evidence to sustain every phase of the decree entered by the annexation court, and it is affirmed.

*Affirmed.*