Amici Curiae: Robert N. Tracci; Edward Stein, Norfolk; W. Lyle Carver; Darrel W. Puckett, Appomattox; Theophani K. Stamos, Arlington; Joel R. Branscom; Paul A. McAndrews ; William W. Davenport, Chesterfield; Paul Walther, Culpeper; Ann Cabell Baskervill; Raymond F. Morrogh, Fairfax; James P. Fisher ; Eric Branscom; Jeff Haislip; Allen 'A.J.' W. Dudley, Jr., Rocky Mount; Ross P. Spicer; Tracy Quackenbush Martin; R.E. 'Trip' Chalkley, III ; M. Andrew Nester; James E. Plowman, Leesburg; Rusty E. McGuire; Theresa J. 'Terry' Royall; Diana Wheeler O'Connell; Stephanie Brinegar Vipperman; Robert Bryan Haskins; Paul B. Ebert, Manassas; Christopher Billias; Marsha L. Garst, Harrisonburg; Marcus McClung; Travis D. Bird; Derek A. Davis; Julia H. Sichol; C.H. 'Chuck' Slemp, III ; Benjamin M. Hahn, Poquoson; Christopher B. Russell ; Nancy G. Parr, Chesapeake; William B. Bray ; LaBravia J. Jenkins, Fredericksburg; H. Clay Gravely, IV, Danville; Donald Caldwell, Roanoke; Thomas E. Bowers ; Colin D. Stolle, Virginia Beach; David L. Ledbetter (James E. Plowman, Leesburg, on brief), in support of petitioners.
Amici Curiae: Andrew P. Miller ; James S. Gilmore, III ; Kenneth T. 'Ken' Cuccinelli, II, Richmond, (William S. Consovoy ; Bryan K. Weir; Consovoy McArthur Park, on brief), in support of petitioners.
Amicus Curiae: Virginia State Conference of the NAACP (David O. Prince ; Allison J. Riggs, on brief), in support of respondents.
Amici Curiae: ACLU and ACLU of Virginia (Hope R. Amezquita; Dale E. Ho; Julie A. Ebenstein, on brief), in support of respondents.
Amici Curiae: David Green and Bridging the Gap in Virginia, Inc. (Rodney F. Page ; Kristen Clarke ; Ezra D. Rosenberg ; Bryan Cave, on brief), in support of respondents.
Amicus Curiae: Fair Elections Legal Network (Jon Sherman; Jan A. Larson ; Jessica Ring Amunson ; Mark P. Gaber ; Jenner & Block, on brief), in support of respondents.
Amici Curiae: A.E. Dick Howard, Charlottesville; Daniel R. Ortiz; Carl W. Tobias; John Paul Jones (Alexander B. Bowerman ; N. Thomas Connally III ; Hogan Lovells, McLean, on brief), in support of respondents.
Amici Curiae: Anton A. Bell, Portsmouth; Michael N. Herring, Shannon L. Taylor, Richmond; Stephanie N. Morales; Gergory D. Underwood ; Bryan L. Porter (Frank K. Friedman ; Erin B. Ashwell ; Woods Rogers, Roanoke, on brief), in support of respondents.
PRESENT: All the Justices *710 OPINION BY CHIEF JUSTICE DONALD W. LEMONS
The dominant role in articulation of public policy in the Commonwealth of Virginia rests with the elected branches. The role of the judiciary is a restrained one. Ours is not to judge the advisability or wisdom of policy choices. The Executive and Legislative Branches are directly accountable to the electorate, and it is in those political venues that public policy should be shaped. From time to time, disagreements between these branches of government require interpretation of our statutes, the Constitution of Virginia, or the United States Constitution. Our proper role is to interpret law and not to express our opinion on policy. The case before us today is such a case.
Article II, Section 1 of the Constitution of Virginia sets out a general rule of law and then provides for an exception: "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." Va. Const. art. II, § 1 (emphasis added). On April 22, 2016, Governor Terence R. McAuliffe issued an Executive Order that inverts this rule-exception sequence. The practical effect of this Executive Order effectively reframes Article II, Section 1 to say: "No person who has been convicted of a felony shall be disqualified to vote unless the convicted felon is incarcerated or serving a sentence of supervised release."
Article I, Section 7 of the Constitution of Virginia provides: "That all power of suspending laws, or the execution of laws, by any authority, without consent of the representatives of the people, is injurious to their rights, and ought not to be exercised." The major question before the Court is whether the Executive Order "suspends" a general principle of voter disqualification and replaces it with a new principle of voter qualification that has not received the "consent of the representatives of the people."
We answer this question against the backdrop of history. Never before have any of the prior 71 Virginia Governors issued a clemency order of any kind-including pardons, reprieves, commutations, and restoration orders-to a class of unnamed felons without regard for the nature of the crimes or any other individual circumstances relevant to the request. To be sure, no Governor of this Commonwealth, until now, has even suggested that such a power exists. And the only Governors who have seriously considered the question concluded that no such power exists.
In this case, Governor McAuliffe asserts that his clemency power in this matter is "absolute" under Article V, Section 12 of the Constitution of Virginia. J.A. at 1. We respectfully disagree. The clemency power may be broad, but it is not absolute. Deeply embedded in the Virginia legal tradition is "a cautious and incremental approach to any expansions of the executive power." Gallagher v. Commonwealth , 284 Va. 444, 451, 732 S.E.2d 22, 25 (2012). This tradition reflects our belief that the "concerns motivating the original framers in 1776 still survive in Virginia," including their skeptical view of "the unfettered exercise of executive power." Id.
In this proceeding, which invokes this Court's original jurisdiction, we also consider several other issues related to the issuance of the Executive Order, and whether writs of mandamus or prohibition lie against the Governor, the Secretary of the Commonwealth, the Virginia Department of Elections, the Commissioner of the Department of Elections, the State Board of Elections, and the Chair, Vice Chair, and Secretary of the State Board of Elections, with respect to actions taken or to be taken in response to this Executive Order.
I. Facts and Proceedings
Governor McAuliffe's Executive Order stated that it removed the political disabilities of approximately 206,000 Virginians who had been convicted of a felony but who had completed their sentences of incarceration and any periods of supervised release, including probation and parole. The civil rights restored by the Executive Order were the rights to vote, to hold public office, to serve on a jury, and to act as a notary public.[1]
*711 When Governor McAuliffe issued the Executive Order, he indicated that he would issue similar orders at the end of each month to restore the rights of Virginians who had been convicted of a felony but who had since completed their sentences of incarceration and supervised release. Governor McAuliffe issued such orders on May 31, 2016, and again on June 24, 2016.[2]
On May 23, 2016, Speaker of the Virginia House of Delegates William J. Howell, Majority Leader of the Virginia Senate Thomas Norment, Jr., and four other Virginia registered voters ("petitioners") filed a petition seeking writs of mandamus and prohibition in this Court against Governor McAuliffe, the Secretary of the Commonwealth, the Virginia Department of Elections, the Commissioner of the Department of Elections, and the State Board of Elections ("respondents"). In their petition, they seek to cancel the voter registrations accomplished pursuant to the Executive Order, prevent further such registrations, and prohibit Governor McAuliffe from issuing additional executive orders categorically restoring the voting rights of felons who have completed their sentences. Petitioners assert that the Governor's Executive Order and any similar subsequent orders effectively ify the Constitution of Virginia's general prohibition against voting by convicted felons who have completed sentences of incarceration and supervision. They contend this assertion of executive authority "defies the plain text of the Constitution, flouts the separation of powers, and has no precedent in the annals of Virginia history."
Petitioners ask this Court to issue a writ of mandamus to compel Commissioner of the Virginia Department of Elections Edgardo Cortés to fulfill his duties under Code § 24.2-404(A)(2), (A)(4), and (A)(6), by removing from the record of registered voters any felon who has registered pursuant to the challenged executive orders, returning those persons to the list of individuals prohibited from voting, and refusing to register any new voters under the orders. Also, petitioners seek to compel Chairman of the Virginia Board of Elections James Alcorn, Vice Chairman of the Virginia Board of Elections Clara Bell Wheeler, and Secretary of the Virginia Board of Elections Singleton McAllister to fulfill their duties under Code § 24.2-404(C) by instituting procedures to ensure that Commissioner Cortés complies with any order we may issue.
Petitioners further ask that we command Secretary of the Commonwealth Kelly Thomasson to comply with her duty under Code § 24.2-404(A)(9) and Code § 53.1-231.1 and delete or omit from the records of felons who have had their political rights restored any person whose rights were restored pursuant to one of the challenged Executive Orders. Additionally, petitioners ask that we command Governor McAuliffe to fulfill his constitutional duty to take care that the laws prohibiting felons from voting are faithfully executed and that his subordinates comply with any order we issue.
With regard to their requested writs of prohibition, petitioners ask that we prevent Governor McAuliffe from issuing further executive orders restoring civil rights to felons on a categorical, as opposed to an individual, basis. Lastly, petitioners seek to forestall Commissioner Cortés, Chairman Alcorn, Vice Chairman Wheeler, Secretary McAllister, and Secretary Thomasson from facilitating the further registration of felons pursuant to any of the allegedly unconstitutional orders. Petitioners also requested this Court expedite consideration of their petition.
Respondents filed a response to the petition for writs of mandamus and prohibition and a motion to dismiss. In their motion to dismiss, respondents assert that petitioners *712 lack standing, have failed to join necessary parties, and have failed to show the Governor lacked the lawful authority to issue the orders in question. Respondents also contend that petitioners have failed to state a claim for mandamus or prohibition and that the Governor's actions were constitutional under the plain language of Article V, Section 12 of the Constitution of Virginia.
We granted the motion for expedited consideration and heard oral argument in this matter on July 19, 2016.
II. Analysis
A. Standing
Whether petitioners have standing to seek mandamus and prohibition relief upon the allegations in their petition, as raised by respondents' motion to dismiss, is a threshold issue and a question of law. See Virginia Marine Res. Comm'n v. Clark , 281 Va. 679, 686-87, 709 S.E.2d 150, 154-55 (2011). In determining whether petitioners have standing to maintain this action, we consider the factual allegations as true. See id. It is incumbent on petitioners to allege facts sufficient to demonstrate standing. See Friends of the Rappahannock v. Caroline Cty. Bd. of Supervisors , 286 Va. 38, 50, 743 S.E.2d 132, 138 (2013).
Standing concerns itself with the characteristics of the individuals who file suit and their interest in the subject matter of the case. Westlake Props. v. Westlake Pointe Prop. Owners Ass'n , 273 Va. 107, 120, 639 S.E.2d 257, 265 (2007). Broadly speaking, standing can be established if a party alleges he or she has a "legal interest" that has been harmed by another's actions. See Radin v. Crestar Bank , 249 Va. 440, 442, 457 S.E.2d 65, 66 (1995). As a general rule, without "a statutory right, a citizen or taxpayer does not have standing to seek mandamus relief ... unless he [or she] can demonstrate a direct interest, pecuniary or otherwise, in the outcome of the controversy that is separate and distinct from the interest of the public at large." Goldman v. Landsidle , 262 Va. 364, 373, 552 S.E.2d 67, 72 (2001). These general requirements of standing apply to applications for writs of mandamus and prohibition. See Moreau v. Fuller , 276 Va. 127, 134-35, 661 S.E.2d 841, 845 (2008).
Here, petitioners base their alleged standing on their status as "qualified voters who live and are registered to vote in the Commonwealth, and who plan to vote in the 2016 General Election." Petitioners allege respondents have directly injured them by allowing the registration of unqualified voters pursuant to the "unconstitutional" Executive Order, thereby diluting their legal votes and infringing their right of suffrage guaranteed under Article I, Section 6 of the Constitution of Virginia. Article II, Section 1 sets forth the qualifications for voters and requires that each voter "be a citizen of the United States," "be eighteen years of age," and be "a resident of the Commonwealth and of the precinct where he votes." Article II, Section 1 further provides that "[n]o person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." See also Code § 24.2-101.
Petitioners contend that the Executive Order is "unconstitutional and does not restore the political rights of any convicted felon." Petitioners also allege respondents' "ongoing, coordinated efforts to register unqualified voters" have not only diluted petitioners' votes, but have also "created an illegitimate electorate, and threatened the legitimacy of the November elections." Petitioners further allege that the Governor's Executive Order has unlawfully enfranchised approximately 206,000 felons.[3]
In turn, respondents assert that petitioners' status as qualified voters does not give them a direct interest in the proceedings separate from the public at large and that their claimed injuries are like the generalized grievances this Court has ruled do not establish standing. Respondents further contend that petitioners lack standing because Code § 24.2-431 is petitioners' exclusive remedy for challenging the registration of ineligible voters.
*713 We begin our analysis with the observation that this case has been brought by Virginia citizens against the Governor of Virginia and other state officials in the Supreme Court of Virginia, alleging violations of the Constitution of Virginia. Accordingly, Virginia law, not federal law, governs every aspect of our decision. The parties and amici present a battery of federal citations addressing the standing doctrine applied to the case-or-controversy provision of Article III of the United States Constitution. The standing issue in our case, however, implicates the capacity of Virginia citizens, who have a legal right to vote, to challenge an executive action which allegedly allows for the registration of unqualified voters.
Under our precedent, a litigant has standing if he has "a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed." Cupp v. Board of Supervisors , 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984). We have never applied this principle to a constitutional claim by voters alleging that an executive action diluted their voting strength in violation of the anti-suspension provision of Article I, Section 7 of the Constitution of Virginia. However, we have recognized that Virginia citizens have standing to assert vote-dilution claims in analogous circumstances.
In Wilkins v. West , 264 Va. 447, 460, 571 S.E.2d 100, 107 (2002), we addressed whether voters had standing to challenge electoral districts allegedly drawn in violation of the compactness and contiguity requirements of Article II, Section 6 of the Constitution of Virginia. We determined residents of districts that do not meet compactness and contiguity requirements are "directly affected by the legislature's failure to comply with the Constitution of Virginia." Id. The unconstitutional configuration of a district gives rise to an "inference of particularized injury" for residents of that district. Id. at 459-60, 571 S.E.2d at 107. We held an individual's residency in an affected district was sufficient to confer standing to challenge non-compliance with a constitutional provision in "the voting context" without "further proof of a personalized injury." Id. at 460, 571 S.E.2d at 107 (quoting United States v. Hays , 515 U.S. 737, 745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ).[4]
Applying the principles enunciated in Wilkins, we conclude that each petitioner, as a Virginia registered voter planning to vote in the 2016 General Election, is directly affected by the allegedly unconstitutional expansion of the statewide electorate and has standing to challenge the Executive Order and respondents' registration of allegedly unqualified voters. Like the complainants in Wilkins who were directly affected in district-wide elections by the legislature's alleged failure to comply with the Constitution of Virginia, petitioners have alleged that they will be directly affected in a statewide general election by respondents' alleged failure to comply with the Constitution of Virginia. Both scenarios arise in "the voting context," id. and both implicate the rights of qualified resident voters.[5]
*714 We disagree with respondents' view that Wilkins should be sidelined because it included a claim that certain districts were racially gerrymandered. That is true, but beside the point. As previously noted, Wilkins also involved a freestanding constitutional claim, conceptually distinct from racial gerrymandering, alleging a violation of the compactness and contiguity requirements of Article II, Section 6. We found that all voters residing within the affected districts had standing to assert their claims. Here, petitioners complain that the Governor's Executive Order adds 206,000 unqualified voters into the statewide electorate. The underlying interest protected by our standing analysis in Wilkins -the right of Virginia voters to seek judicial review of unconstitutional manipulations of the electorate-parallels the interest asserted by petitioners in this case. The specific manipulation is different, but the standing analysis is the same. As three former Attorneys General argue in their amicus brief, this case
presents a textbook claim of vote dilution. When a pool of voters is made larger, each vote carries less weight: a vote is worth more if there are 10 other voters than if there are 100,000 other voters. Here, the Governor has unlawfully allowed felons to register on a global basis. That action has added (and will continue to add) thousands of citizens to the pool of eligible voters which, in turn, weakens the strength of those Virginians who were already eligible to cast a ballot.
....
Governor McAuliffe's executive order has unlawfully increased the eligible voting population in electoral districts across the Commonwealth. There are now individuals residing in Petitioners' districts who will be permitted to vote even though they do not hold that right under the Constitution. The Governor's action, in other words, unconstitutionally inflates the size of the electorate both in those districts and across the Commonwealth (thus diluting Petitioners' votes in statewide contests).
Former Attorneys General Amicus Br. in Support of Petitioners at 27-28 (citations omitted).
We acknowledge the assertion that, in vote-dilution cases, "the concept of 'packing' requires a comparison," post at 39, 788 S.E.2d at 729, and that no such comparison exists in this case. No authorities are cited for this proposition, however, and we are aware of none. At any rate, the relevant comparison here is between a statewide electorate packed with 206,000 disqualified voters and one without them. Every qualified voter (though not every member of the general public) suffers the same vote-dilution injury. To rule otherwise would be to hold that unlawful vote dilution occurring within a geographic subset of a state triggers standing, but an equally unlawful vote dilution of far greater proportions, one affecting the entire state, does not.
That said, we emphasize that our standing conclusion rests heavily on the unprecedented circumstances of this case. The sweeping scope of the Executive Orders precludes any assertion that its vote-dilution effect should be dismissed as de minimis. The strength of this point is compounded by the fact that the Executive Orders identify none of the 206,000 felons by name, and, to date, Governor McAuliffe has withheld "the administration's list of felons whose rights were restored" under the Executive Orders. Virginia Freedom of Information Advisory Council, Advisory Op. AO-01-16 (July 11, 2016) (citing Code §§ 2.2-3705.7 and 24.2-404(B) ); see Code § 30-179(1) (authorizing the Virginia Freedom of Information Advisory Council to issue advisory opinions).
*715 In short, this case involves an allegation by Virginia citizens that their votes have been diluted by the unconstitutional addition of 206,000 disqualified voters to the statewide electorate. Like the voters in Wilkins , petitioners in this case have standing to assert that their voting rights have been harmed by an allegedly unconstitutional manipulation of the electorate. We thus have authority to decide this dispute.[6] To not do so would be an inexcusable failure on our part to fulfill our duty to interpret and apply Virginia law in a case where the parties are "actual adversaries" and the legal issues have been "fully and faithfully developed." Cupp , 227 Va. at 589, 318 S.E.2d at 411. This is not a case, therefore, in which we are invited to answer "abstract questions" that may be "interesting and important to the public" but lack any real "errors injuriously affecting" the complaining litigants. Nicholas v. Lawrence , 161 Va. 589, 593, 171 S.E. 673, 674 (1933).[7]
Finally, we find no merit in respondents' argument that Code § 24.2-431 provides the exclusive remedy for petitioners' allegations and that recognizing their standing in this action would improperly circumvent Code § 24.2-431. Code § 24.2-431 allows three qualified voters to file a petition in the circuit court of the county or city in which they are registered, stating their objections to the registration of any person whose name is on the registration records for their city or county. Respondents correctly note that when "a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise." Concerned Taxpayers of Brunswick Cty. v. County of Brunswick , 249 Va. 320, 330, 455 S.E.2d 712, 717 (1995) (citations omitted). This rule, however, does not apply here. Although statutory rights may create a legal interest giving rise *716 to statutory standing, petitioners' interest in this case is not created exclusively by statute. Petitioners allege the Executive Order and respondents' implementation of it are unconstitutional and have impaired their voting rights. Accordingly, petitioners' standing in this case is not dependent upon Code § 24.2-431.
B. Necessary Parties
In their motion to dismiss and response brief, respondents contend petitioners have failed to join necessary parties. They assert that the persons whose political disabilities the Governor has removed are necessary parties because petitioners seek to impair or impede their rights by reimposing the political disabilities. Absent a statutory requirement, the necessary party doctrine does not implicate subject matter jurisdiction. Michael E. Siska Revocable Tr. v. Milestone Dev., LLC , 282 Va. 169, 173-81, 715 S.E.2d 21, 23-27 (2011).
A court can choose to proceed without a necessary party if (1) it is "practically impossible" to join a necessary party and the missing party is represented by other parties who have the same interests; (2) the missing party's interests are separable from those of the present parties, so the court can rule without prejudicing the missing party; or (3) a necessary party cannot be made a party, but the court determines that the party is not indispensable. Marble Techs., Inc. v. Mallon , 290 Va. 27, 32, 773 S.E.2d 155, 157 (2015) (quoting Siska , 282 Va. at 176, 179-80, 715 S.E.2d at 25, 27 ); Rule 3:12(c). In this case, it would be "practically impossible" to join the 206,000 convicted felons whose political disabilities were restored by the Executive Orders. Further, these individuals are ably represented by respondents. Accordingly, we deny the respondents' motion to dismiss on this ground.
C. Constitutionality of the Executive Order
1.
Relying on his clemency power under Article V, Section 12 of the Constitution of Virginia, Governor McAuliffe's Executive Order sought "to restore the political rights of any persons disqualified by Article II, Section 1." J.A. at 1. The voter-disqualification provision in Article II, Section 1 of the Constitution of Virginia provides: "No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority." Felons may request that their civil rights be restored, and Article II, Section 1 grants the Governor the power to consider and act on those requests.
Scores of restoration orders have been issued for more than a century to specific felons who requested that their civil rights be restored. Never before, however, have any of the prior 71 Virginia Governors issued a sua sponte clemency order of any kind, whether to restore civil rights or grant a pardon, to an entire class of unnamed felons without regard for the nature of the crimes or any other individual circumstances relevant to the request. What is more, we are aware of no point in the history of the Commonwealth that any Governor has even asserted the power to issue such an order.
This issue is not a new one. As recently as 2010, Governor Tim Kaine openly expressed his disagreement "with the current policy embodied in the Constitution of Virginia that a felony conviction automatically leads to permanent disenfranchisement." J.A. at 4. Shortly before the end of his term in office, Governor Kaine was asked to exercise his "executive power ... to restore voting rights to an unknown number of unnamed individuals who have not applied to have their voting rights restored." Id. at 3. In response, Governor Kaine undertook "a very careful review of [this] proposal." Id.
In a letter issued on his behalf by Mark Rubin, Counselor to the Governor, Governor Kaine concluded that the voter-disqualification provision did not authorize a "blanket use" of the restoration power to "benefit unnamed individuals." Id. The better understanding of the provision, he concluded, was that the power could be exercised only "in particular cases to named individuals for whom a specific grant of executive clemency is sought." Id. at 4. Consequently, "[a] blanket order restoring the voting rights of everyone *717 would be a rewrite of the law rather than a contemplated use of the executive clemency powers." Id. The very "notion that the Constitution of the Commonwealth could be rewritten via executive order is troubling." Id. Citing his "pledge to uphold the Constitution," Governor Kaine refused to "issue a blanket restoration of rights to unnamed individuals" on a categorical basis. Id.[8]
Because Governor Kaine's view explains the uniform practice of all Governors to date, the political process has been steadily churning on this issue for decades. Since the 1980s, unsuccessful attempts have been made to amend the Constitution of Virginia on the subject of restoration of civil rights. At least 69 resolutions and bills addressing categorical exclusions to the voter-disqualification provision in Article II, Section 1, were offered during each of the legislative sessions from 2004 through 2016, including one continued to the 2017 legislative session-and all have failed to pass the General Assembly. Nearly half of these failed resolutions and bills addressed the categorical basis of the Governor's order.[9]
Representative of these failed efforts was H.J. Res. 119 (2016), which proposed to replace the current conditional language of Article II, Section 1 ("unless his civil rights have been restored by the Governor or other appropriate authority") with the following new conditional language: "unless he has served his full sentence and has been released back to civil society." None of these efforts would have been necessary if the power sought had always existed, unnoticed and unclaimed, since 1870, as Governor McAuliffe contends.
We recognize that these observations do not preclude us from recognizing a novel executive power that no prior Governor ever believed existed. "Long settled and established practice" has never been considered to be "binding on the judicial department." Pocket Veto Case , 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929). And we do not consider it to be binding upon us. We do, however, consider it to be highly persuasive. As Justice Holmes so succinctly put it, "a page of history is worth a volume of logic." New York Tr. Co. v. Eisner , 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921). When government actors have adopted a "practical construction" of a constitutional provision that "has been acquiesced in for a considerable period, considerations in favor of adhering to this construction sometimes present themselves to the courts with a plausibility and force which ... is not easy to resist," especially "where a particular construction has been generally accepted as correct." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States 102 (Victor H. Lane ed., 7th ed. 1903).
That observation is particularly strong when courts review the scope of executive power. In that context, the "longstanding 'practice of the government,' " NLRB v. Canning , --- U.S. ----, 134 S.Ct. 2550, 2560, 189 L.Ed.2d 538 (2014) (quoting McCulloch v. Maryland , 17 U.S. (4 Wheat.) 316, 401, 4 L.Ed. 579 (1819) ), has traditionally played an important role in informing "our determination of 'what the law is,' " id. (quoting Marbury v. Madison , 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ). The "practical construction" given by the executive department "through a long course of years" should be treated as "a consideration of great weight in a proper interpretation" of the scope of executive *718 power. Pocket Veto Case , 279 U.S. at 688-89, 49 S.Ct. 463 (emphasis added).
This common-sense inference resonates even more strongly when governmental actors, contrary to the natural tendency of those with concentrated power, unwaveringly utilize a "practical construction," id. at 688, 49 S.Ct. 463, which limits the scope of their power. "[J]ust as established practice may shed light on the extent of power conveyed," it is equally true that "the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." BankAmerica Corp. v. United States , 462 U.S. 122, 131, 103 S.Ct. 2266, 76 L.Ed.2d 456 (1983) (citation omitted). As Justice Frankfurter reasoned, "a consistent and unexplained failure to exercise power not obviously conferred by legislation may be equally persuasive that the power claimed was never conferred." United States v. American Union Transp., Inc. , 327 U.S. 437, 458-59, 66 S.Ct. 644, 90 L.Ed. 772 (1946) (Frankfurter, J., dissenting); accord Utility Air Regulatory Grp. v. EPA , 573 U.S. ----, ----, 134 S.Ct. 2427, 2444, 189 L.Ed.2d 372 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate ..., we typically greet its announcement with a measure of skepticism.").
As applied to the executive power of a Virginia Governor, we found this interpretative inference persuasive in Lewis v. Whittle , 77 Va. 415 (1883). That case addressed whether a Governor had the power to remove individuals from the board of visitors of a public college. Three decades of "successive governors" had interpreted the executive power to preclude this power. Id. at 420-22. The executive power at issue received this "construction at the hands of successive governors, who, during many successive terms of office" had consistently interpreted their power to be limited. Id. at 422. Though not dispositive, we gave considerable weight to this construction and found the aberrant interpretation offered by the then-current Governor was an "ingeniously disguised" effort to create, through a "strained construction" of the governing statutes, an executive power that had no precedent in law or practice. Id.
Lewis counsels that we accord interpretive respect to the unbroken historical record of the last 71 Governors of Virginia. None of them claimed the executive power under Article V, Section 12 to grant reprieves, pardons, and commutations, and to remove political disabilities was absolute , subject to no restraining principle of law whatsoever. Governor McAuliffe's contention to the contrary is unprecedented. All prior Governors exercised their clemency powers-including pardons, reprieves, commutations, and restorations-on an individualized case-by-case basis taking into account the specific circumstances of each.[10] The self-restraint of these Governors *719 paralleled our "cautious and incremental approach to any expansions of the executive power" and remained faithful to the belief that the "concerns motivating the original framers in 1776 still survive in Virginia," including their skeptical view of "the unfettered exercise of executive power." Gallagher , 284 Va. at 451, 732 S.E.2d at 25.
2.
Governor McAuliffe does not dispute the historical record. Instead, he argues that the literal text of Article V, Section 12 clearly shows that his 71 predecessors failed to appreciate the unlimited nature of their executive powers in such matters. From reading only the constitutional text, the Governor contends, we should conclude that it "plainly authorizes the group restoration-of-rights at issue here." Resp. to Verified Pet. at 2. He also sees in the same provision the implicit authority of a Virginia Governor to issue "blanket" class-based pardons and amnesties similar to those issued by U.S. Presidents. Id. at 43-44.
We find this textual argument to be overstated at best. The assertion that a Virginia Governor has the power to grant blanket, group pardons is irreconcilable with the specific requirement in Article V, Section 12 that the Governor communicate to the General Assembly the "particulars of every case" and state his "reasons" for each pardon. This requirement implies a specificity and particularity wholly lacking in a blanket, group pardon of a host of unnamed and, to some extent, still unknown number of convicted felons. No such requirement exists in the United States Constitution, and thus, the text of Article V, Section 12 of the Constitution of Virginia undermines the Governor's argument by analogy. See also supra note 10.
Governor McAuliffe fairly notes, however, that the particularized reporting requirement in Article V, Section 12 does not specifically mention the removal of political disabilities. From that omission, he contends, we should at least infer that the absence of a particularized reporting requirement for restoration orders implies the presence of an unlimited (or, to quote the Governor, an "absolute") power to issue blanket, group restoration orders even if we were skeptical of doing so for blanket, group pardons.
In response, petitioners point out that the reporting requirement was added to the Constitution of Virginia in 1851, prior to the adoption of the "removal of political disabilities" provision in 1870-thus leaving open the inference that the reporting requirement would be naturally understood to apply in pari materia to all acts of executive clemency, including restoration orders.[11] This inference, they contend, gains strength from the absence of any suggestion that the reporting requirement was meant to alter the shared nature of the various clemency powers. In any event, petitioners conclude, even if no reporting requirement did apply to restoration orders, it is simply a bridge too far to infer that the absence of a mere reporting requirement constitutes an express endorsement of the Governor's claim of absolute power to issue blanket, group restoration orders. That is particularly true, petitioners add, if he has no such authority with respect to every other act of clemency within his authority.
On a second line of argument, petitioners contend that an equally plausible inference is *720 that, even if the Governor need not report the particulars of each removal of political disabilities, the nature of that power is no different than all the other clemency powers, each of which requires an individualized consideration. The Governor provides no explanation for why the power to remove political disabilities alone should be any different in its essential character from all the other clemency powers, such as the pardon power, the power to remit fines, or the power to commute capital punishment-particularly when all of those clemency powers, grouped together in the same clause, have by unanimous historical practice involved individualized determinations.
The plausibility of these competing inferences undermines Governor McAuliffe's argument that the literal text of Article V, Section 12 "plainly" acknowledges his newly-found power to issue a "group restoration-of-rights" executive order, Resp. to Verified Pet. at 2, to a class of unnamed felons, numbering approximately 206,000, without any consideration of their particular circumstances. We thus reject the Governor's contention that a faithful reading of the text of Article V, Section 12 endorses his assertion of absolute power to issue clemency orders that his 71 predecessors thought to be of dubious provenance.
3.
As strong as it is, we need not rely solely on the interpretative inference that arises from the uninterrupted disuse of governmental power. Governor McAuliffe's assertion of "absolute" power to issue his executive order, J.A. at 1, runs afoul of the separation-of-powers principle protected by Article I, Section 7 of the Constitution of Virginia. That provision declares: "That all power of suspending laws, or the execution of laws, by any authority, without consent of the representatives of the people, is injurious to their rights, and ought not to be exercised." Though somewhat obscure to modern readers, this provision was considered by the Framers of our Commonwealth as an essential pillar of a constitutional republic.
The anti-suspension provision first appeared as Section 7 of the 1776 Virginia Declaration of Rights, the drafting of which has been commonly credited to George Mason.[12] Years later, when the United States Constitution was drafted and submitted to the States for ratification, the Virginia Ratification Convention of 1788 noted the absence of a specific anti-suspension provision in the Philadelphia draft. Some delegates, including Patrick Henry, argued the federal constitution vested too much power in the Presidency. "Your President may easily become king," Henry warned, because if the "American chief be a man of ambition and abilities, how easy is it for him to render himself absolute!" 3 Jonathan Elliot, The Debates in the Several State Conventions of the Adoption of the Federal Constitution 58-69 (1827) (transcribing the oratory of Patrick Henry during the proceedings on June 5, 1788).
For this reason, as well as others, Henry and other delegates voted against the Philadelphia draft. The Convention nonetheless approved the draft by a vote of 89 to 79. See id. at 654-55. Henry's arguments, however, resonated enough with those voting in favor to warrant a specific recommendation by the Convention to the First Congress that the *721 text of Virginia's anti-suspension provision be incorporated verbatim (along with other rights) into a recommended "declaration or bill of rights asserting, and securing from encroachment, the essential and unalienable rights of the people." Id. at 657 (recording the proceedings of June 27, 1788).[13]
Although the First Congress declined to include the anti-suspension provision in the Federal Bill of Rights, Virginia has steadfastly held to the separation-of-powers principle first recognized in its 1776 Virginia Declaration of Rights. The anti-suspension provision has been repeated, without alteration, in all subsequent versions of the Constitution of Virginia. See Va. Const. art. I, § 7 (1830); Va. Const. art. I, § 7 (1851); Va. Const. art. I, § 7 (1864); Va. Const. art. I, § 9 (1870); Va. Const. art. I, § 7 (1902); Va. Const. art. I, § 7 (1971).
The Framers of the Constitution of Virginia of 1776 and the delegates to the Virginia Ratification Convention of 1788 insisted on the anti-suspension provision because of their distrust of concentrated executive power. They held this historic distrust based on the "arbitrary practice" of English Kings before the Glorious Revolution in 1688. Edmund Randolph, Essay on the Revolutionary History of Virginia 1774-1782, in 44 Va. Mag. Hist. & Biography 35, 46 (1936). From the royal perspective, the "dispensing and suspending powers were understood to be absolute. Not merely powers held under law, they developed as sovereign powers outside and above the law." Hamburger, supra note 12, at 65.
The widespread fear of the assertion of absolute executive power led to the adoption of the English Bill of Rights in 1689, which expressly repudiated "the pretended Power of Suspending of Laws or the Execution of Laws by Regall Authority without Consent of Parlyament." The Bill of Rights, 1 W. & M., Sess. 2, ch. 2 (1689).[14] As one historian has explained:
The reign of James II, and to a lesser extent that of Charles II, provided the historical background of the provisions of the [English] Bill of Rights. One of the most serious grievances which the document sought to correct was the use of the royal prerogative for the purpose of suspending and dispensing with laws. In the past English kings had often exercised without question a rather vague dispensing power, that is, a power of making exceptions to the laws in particular cases. This power was closely related to the power of pardoning offenses against the laws.
Sources of Our Liberties, supra note 13, at 224; see also Hamburger, supra note 12, at 67-69.
Historically, the regal power to provide individualized favor in particular cases was treated differently than the illegitimate "power of suspending a law so that person in general might treat it as being nonexistent." F.W. Maitland, The Constitutional History of England 302-03 (1919). "The line between the two powers ... can be theoretically marked-the dispensation applies to this or that individual, a suspending of the statute would free all men, and yet, of course, the dispensing power might be so lavishly used that it would practically operate to suspend the laws." Id. at 304.
After the promulgation of the English Bill of Rights, it became a "maxim in law, that it requires the same strength to dissolve, as to create an obligation," and thus, "the suspending or dispensing with law by regal authority" was considered unlawful. 1 William *722 Blackstone, Commentaries *185-86.[15] Lord Mansfield was just as certain of this maxim: "I can never conceive the prerogative to include a power of any sort to suspend or dispense with laws." 16 The Parliamentary History of England 267 (T.C. Hansard ed., 1813). After all, Mansfield explained, "the duty of [the executive] is to see the execution of the laws" and that "can never be done by dispensing with or suspending them." Id.
In the decade prior to the American Revolution, it thus became commonplace for Englishmen to say confidently that "a suspending power is not, cannot be a legal prerogative, in any circumstances, or under any pretense whatsoever, because the tendency of the exercise of such a prerogative is destructive to the Constitution." Hamburger, supra note 12, at 73 (quoting A Speech Against the Suspending and Dispensing Prerogative 24 (6th ed. 1767)). That view was shared by many legal commentators. See 1 Sir William R. Anson, Law and Custom of the Constitution 311-19 (3d ed. 1897) (observing that the King's power to "deviat[e] occasionally from the rigour of a general prohibition," when used without limitation, "amount[ed] to an abrogation" of law); 3 Henry Hallam, The Constitutional History of England 63 (1897) (recognizing that the regal practice of making exceptions to general law "for the sake of conferring a benefit on individuals ... became intolerable when exercised in contravention of the very principle" inherent in the generally applicable law); Homersham Cox, The Institutions of the English Government 22 (1863) (observing that "the reiterated effect of the dispensing power would be tantamount to an exercise of the suspending power").
There has never been a single, precisely calibrated definition of what constitutes an unlawful executive suspension of laws. It seems clear, however, that two characteristics typically accompany it. The most obvious is when an executive sets aside a generally applicable rule of law based solely upon his disagreement with it. In Virginia such an act would contravene his constitutional "duty to take care that the laws be faithfully executed," Va. Const. art. V, § 7, which presupposes that the executive does not have the option of being unfaithful to laws with which he disagrees. Another characteristic of an unlawful executive suspension is its expansive scope and generality. The more categorical it is, the less likely it will truly represent a permissible deviation from a general rule of law, and thus, the more likely it will result in a suspension of all or part of the disfavored general rule.
In this case, Governor McAuliffe has openly declared his disagreement with the voter-disqualification provision in Article II, Section 1 of the Constitution of Virginia. Although the Governor is entitled to champion his views, he cannot do so in contravention of law. Governor Kaine had no less of an objection, but he correctly understood that "[a] blanket order restoring the voting rights of everyone would be a rewrite of the law rather than a contemplated use of the executive clemency powers." J.A. at 4. We believe Governor McAuliffe's order has exactly that effect: It seeks not to mitigate the impact of the general voter-disqualification rule of law on an individualized basis but, rather, to supersede it entirely for an indiscriminately configured class of approximately 206,000 convicted felons, without any regard for their individual circumstances and without any specific request by individuals seeking such relief.
4.
We acknowledge the contention that the Governor's Executive Order did not wholly suspend the operation of the voter-disqualification provision. As to convicted felons presently incarcerated in the Commonwealth's penitentiaries, for example, the Governor did not grant the rights to vote, to hold public office, to serve on a jury, and to act as a notary public. Even so, we fail to see why this matters. If, as the Governor asserted, he *723 had "absolute" power in this regard, J.A. at 1, he could have done so. We find no merit in the assertion that a partial violation is no violation at all.
Underlying this all-or-nothing objection is the elusive distinction between the regal power of dispensation and suspension. An English king's power to "dispense" with general law usually took the form of royal "permission given to an individual to disobey a statute." 6 W.S. Holdsworth, A History of English Law 217 (1924). The suspending power was far broader. It had the effect of an "abrogation" of a general rule of law in favor of unnamed individuals within the class affected by the law. Id. "The difference, therefore, between these two powers consists rather in the extent to which the law is abrogated than in the quality of the prerogative exercised." Id. (emphasis added).
In this case, the general rule of law is clear: "No person who has been convicted of a felony shall be qualified to vote." Va. Const. art. II, § 1 (emphasis added). Equally clear is the exception to the general rule: "unless his civil rights have been restored by the Governor or other appropriate authority." Id. (emphasis added). Governor McAuliffe's Executive Order has rewritten the provision to invert the rule and the exception. Under his order, no person who has been convicted of a felony shall be disqualified to vote unless the felon is incarcerated or serving a sentence of supervised release.
This rule-exception inversion may appear subtle to some, but it undermines the very basis for the legitimate use of the executive restoration power. All agree that the Governor can use his clemency powers to mitigate a general rule of law on a case-by-case basis. But that truism does not mean he can effectively rewrite the general rule of law and replace it with a categorical exception. The express power to make exceptions to a general rule of law does not confer an implied power to change the general rule itself. The unprecedented scope, magnitude, and categorical nature of Governor McAuliffe's Executive Order crosses that forbidden line.
We also acknowledge, but reject, the rather bold assertion that the anti-suspension provision has no role to play as a check on any of the Governor's clemency powers. See Law Professors Amici Curiae Br. in Support of Respondents at 15-16.[16] The argument begins with the observation that a single pardon issued "on an individual basis" is "in a sense" an executive act that has the effect of "suspending laws, or the execution of laws." Id. at 15 (citing Lee v. Murphy , 63 Va. 789, 797 1872 ). While this may be accurate in its limited application, it does not support the sweeping proposition that the anti-suspension provision "does not bar any exercise of the clemency powers." Id. at 16 (emphasis added).
If the anti-suspension provision has no role to play as a check on any of the Governor's clemency powers, this view, taken to its logical limits, would empower a Virginia Governor to suspend unilaterally the enforcement of any criminal law in the Code of Virginia, based solely on his personal disagreement with it, simply by issuing categorical, absolute pardons to everyone convicted of his disfavored crime. This view would similarly empower a Governor to issue a single, categorical order restoring voting rights to all felons-even those imprisoned, those subject to a supervised criminal sentence, and those released from prison but later civilly committed as sexual predators-thereby eliminating any remaining vestige of the general voter-disqualification rule in Article II, Section 1 of the Constitution of Virginia. We find it difficult to believe that either of these hypotheticals would not be viewed as modern examples of the kind of regal excesses condemned by the English Bill of Rights following the Glorious Revolution in 1688. We thus reject *724 the assertion by amici that the anti-suspension provision "does not bar any exercise of the clemency powers." Id. at 16; cf. Hutton v. McCleskey , 132 Ark. 391, 200 S.W. 1032, 1033 (1918) (applying the anti-suspension provision in the Arkansas Constitution to an executive clemency order that functioned like a "general amnesty" and thus operated as an unconstitutional "suspension of the law").
In sum, Governor McAuliffe's Executive Order has the attributes of an ultra vires assertion of the suspending power that has been forbidden by our Constitution since 1776. Though we exercise our duty of judicial review with great circumspection, we must honor the axiom that "[i]t is emphatically the province and duty of the judicial department to say what the law is." Marbury , 5 U.S. at 177. Given this responsibility, we declare the Executive Order issued on April 22, 2016, as well as those issued on May 31, 2016, and June 24, 2016, to be in violation of Article I, Section 7 (the anti-suspension provision) and Article II, Section 1 (the voter-disqualification provision) of the Constitution of Virginia.
D. The Remedy
The ancient common-law writ of mandamus is among our powers of original jurisdiction. Va. Const. art. VI, § 1 ; see also Code § 8.01-649 ; Rule 5:7(b). The writ is "an extraordinary remedy employed to compel a public official to perform a purely ministerial duty imposed upon him by law." In re Horan , 271 Va. 258, 258, 634 S.E.2d 675, 676 (2006) (citations omitted). "A ministerial act is an act that one performs in obedience to a legal mandate and in a prescribed manner, without regard to his own judgment as to the propriety of the act to be done." City of Richmond v. Hayes , 212 Va. 428, 429, 184 S.E.2d 784, 785 (1971).[17]
As a result of our holding that the Executive Orders are unconstitutional, no election official in the Commonwealth has the discretion to enforce them. To the contrary, all such officials have a prospective duty to ensure that only qualified voters are registered to vote.[18] We thus order the Secretary of the *725 Commonwealth, the State Board of Elections, the Virginia Department of Elections, and their various employees, agents, chairpersons, and commissioners to take the following actions:
(1) The Department of Elections and Commissioner Edgardo Cortés, on or before August 25, 2016, consistent with his duty to "[r]equire the general registrars to delete from the record of registered voters the name of any voter who ... has been convicted of a felony," Code § 24.2-404(A)(3), shall cancel the registration of all felons who have been invalidly registered under Executive Orders issued on April 22, 2016, May 31, 2016, and June 24, 2016.
(2) The Department of Elections and Commissioner Cortés, on or before August 25, 2016, shall "[r]equire the general registrars to enter the names of all registered voters into the [voter registration] system and to change or correct registration records as necessary," Code § 24.2-404(A)(2), by refusing to register anyone whose political rights have purportedly been restored by Executive Orders issued on April 22, 2016, May 31, 2016, and June 24, 2016, and by canceling the registration of anyone who has registered pursuant to such orders.
(3) The Department of Elections and Commissioner Cortés, on or before August 25, 2016, shall "[r]etain ... information received regarding ... felony convictions," Code § 24.2-404(A)(6), by returning to the list of prohibited voters the name of any felon whose political rights have purportedly been restored by Executive Orders issued on April 22, 2016, May 31, 2016, and June 24, 2016.
(4) The State Board of Elections and Chairman James B. Alcorn, Vice Chair Clara Bell Wheeler, and Secretary Singleton B. McAllister, on or before August 25, 2016, "shall institute procedures to ensure that" the Department of Elections and Commissioner Cortés carry out their duties under this Court's order, Code § 24.2-404(C).
(5) Secretary Kelly Thomasson, on or before August 25, 2016, shall maintain and provide to the Department of Elections accurate records of individuals whose political rights have been lawfully restored, by deleting and omitting from the records any felons whose political rights were purportedly restored by Executive Orders issued on April 22, 2016, May 31, 2016, and June 24, 2016. See Code §§ 24.2-404(A)(9), 53.1-231.1.
Writ of Mandamus Issued.[19]

The Executive Order states that it effects "the removal of the political disabilities consequent upon conviction of a felony imposed by Article II, Section 1 of the Constitution of Virginia," which under the language of the order includes the rights to vote, to hold public office, to serve on a jury, and to act as a notary public. The only political disability imposed by Article II, Section 1, however, is the loss of the right to vote. Given our holding, we need not address the impact, if any, of this discrepancy.

We will refer to these orders, along with the April 22 Executive Order, collectively as the "Executive Orders." Our analysis of the lawfulness of the April 22 Executive Order applies with equal force to the May 31 and June 24 orders.

Respondents acknowledge, as of June 20, 2016, pursuant to the Governor's Executive Orders, 7,620 felons have registered to vote in the 2016 General Election. See Resp. to Verified Pet. at 2.

Our cases have also assumed standing existed in cases involving allegations of unlawful vote dilution. See, e.g., Wilkins v. Davis, 205 Va. 803, 804, 810, 139 S.E.2d 849, 853-54 (1965) (upholding a challenge to a redistricting scheme by a "duly qualified voter and taxpayer" because the districts did not contain "as nearly as practicable an equal number of inhabitants"); Davis v. Dusch, 205 Va. 676, 677, 139 S.E.2d 25, 25-26 (1964) (allowing a suit by city residents to compel the city council to reapportion the seats on the city council); Brown v. Saunders, 159 Va. 28, 31-32, 46, 166 S.E. 105, 105, 111 (1932) (upholding a challenge to a redistricting scheme by a candidate for the United States House of Representatives because the "inequality" in numbers between the districts was "obvious, indisputable, and excessive").

Our dissenting colleagues rely on Goldman v. Landsidle, 262 Va. 364, 552 S.E.2d 67 (2001), a taxpayer standing case. In Goldman, taxpayers filed suit seeking a judicial order requiring the state comptroller to ensure "that certain public officials actually have incurred office expenses before disbursing state funds to them for those expenses." Id. at 367, 552 S.E.2d at 68-69. We held that citizens qua taxpayers, absent express statutory authorization, do not have "taxpayer standing" to seek judicial review of the state comptroller's official actions. Id. at 373-74, 552 S.E.2d at 72-73. Nothing in Goldman addressed standing principles applicable to a vote-dilution claim. Wilkins, decided a year later, did not mention Goldman because it had no bearing on a constitutional claim of vote dilution caused "by the legislature's failure to comply with the Constitution of Virginia." Wilkins, 264 Va. at 460, 571 S.E.2d at 107 ; accord FEC v. Akins, 524 U.S. 11, 22-23, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (distinguishing "taxpayer standing" from "voter standing" and stating that the "legal logic" critical to the former is "beside the point" in the latter).
We also find unpersuasive the dissent's reliance on Cherrie v. Virginia Health Servs., 292 Va. ---, 787 S.E.2d 855, 2016 WL 3901455 (2016). The concept of statutory standing addresses only whether a litigant has a legally cognizable right of action to assert a statutory claim. Id. at ----, 787 S.E.2d at 859. The presence or absence of a statutory right of action has no impact on the question whether a litigant has standing to assert a constitutional claim of vote dilution.

In addition to claiming standing as qualified voters, Speaker Howell and Senator Norment allege they have been injured in their capacity as members of the General Assembly because the Executive Order "trenches upon the General Assembly's role in initiating constitutional amendments." Senator Norment also asserts standing in his capacity as a candidate who plans to seek re-election in 2019 and contends he will be injured if he is required to compete for re-election in an "invalidly constituted electorate." Given our holding, we need not address these alternative grounds for establishing standing.

Justice Powell's dissent relies on federal cases to support the assertion that petitioners' standing would not be recognized in a federal court under analogous circumstances. Even if we consider these authorities controlling, see supra at 7, 788 S.E.2d at 712 , we would respectfully disagree with her interpretation of them. The principal case relied upon is Evenwel v. Abbott, 578 U.S. ----, 136 S.Ct. 1120, 1123, 194 L.Ed.2d 291 (2016), which held a State could "draw its legislative districts based on total population" rather than voter-eligible population. The holding did not address, much less turn upon, the doctrine of standing. Indeed, if the plaintiffs in Evenwel did not have standing, the Court would have never reached the merits of their constitutional claim. The only mention of "standing" in the opinion was a footnote explaining why it was not an issue. See id. at 720 n.12, 136 S.Ct. at 1131 n.12 (observing that voters could establish standing by asserting their "votes were diluted" but that the "Court has not considered standing of nonvoters," a question that was "unlikely ever to arise given the ease of finding voters to serve as plaintiffs").
For this reason, we are unpersuaded by Justice Powell's view that Evenwel narrowed existing vote-dilution principles applicable under federal standing law-which has traditionally recognized that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Purcell v. Gonzalez, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam) (quoting Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ); Duncan v. Coffee Cty., 69 F.3d 88, 94 n.3 (6th Cir. 1995) (observing that, "[n]aturally, any time voters are added to the rolls ... those already on the rolls have had their votes diluted"); see also Department of Commerce v. United States House of Representatives, 525 U.S. 316, 331-32, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) (finding standing because "[w]ith one fewer Representative, Indiana residents' votes will be diluted"); Michel v. Anderson, 14 F.3d 623, 626 (D.C. Cir. 1994) (finding standing because "voters have standing to challenge practices that are claimed to dilute their vote, such as being placed in a voting district that is significantly more populous than others"), rejected on other grounds by Raines v. Byrd, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (rejecting standing for members of Congress based on the loss of political power); accord Akins, 524 U.S. at 21, 118 S.Ct. 1777 (finding that all voters have constitutional standing to file suit alleging that the FEC withheld public information that "would help them (and others to whom they would communicate it) to evaluate candidates for public office").

In 2013, a bipartisan committee appointed by Attorney General Kenneth Cuccinelli also concluded a Virginia Governor "cannot institute by executive order an automatic, self-executing restoration of rights," J.A. at 7, and may remove political disabilities only after "individualized consideration and individualized grant of clemency," id. at 8.

See H.J. Res. 92 (2016); H.J. Res. 604 (2015); H.J. Res. 621 (2015); H.J. Res. 627 (2015); H.J. Res. 628 (2015); S.J. Res. 293 (2015); H.J. Res. 70 (2014); H.J. Res. 107 (2014); H.J. Res. 563 (2013); H.J. Res. 603 (2013); H.J. Res. 664 (2013); H.J. Res. 17 (2012); H.J. Res. 125 (2012); H.J. Res. 497 (2011); H.J. Res. 524 (2011); H.J. Res. 610 (2011); H.J. Res. 634 (2011); H.J. Res. 16 (2010); H.J. Res. 42 (2010); H.J. Res. 70 (2010); H.J. Res. 116 (2010); H.J. Res. 182 (2009); H.J. Res. 623 (2009); H.J. Res. 664 (2009); H.J. Res. 677 (2009); H.J. Res. 182 (2008); H.J. Res. 29 (2007); H.J. Res. 680 (2007); S.J. Res. 15 (2007); H.J. Res. 29 (2006); S.J. Res. 15 (2006).

The Governor contends we should not infer that this unbroken history of disuse implies the absence of power, but instead we should look at examples of broad grants of amnesty and pardon by United States Presidents. These examples include an impressive list beginning with President Washington's pardon of participants in the 1791 Whiskey Rebellion and ending with President Carter's pardon of Vietnam War draft dodgers. See Respondents' Br. at 42-43 & n.153. We find this analogy unpersuasive. If examples of categorical federal pardons-dating back to George Washington-supported the argument for categorical restoration orders under Virginia law, then why have 71 Virginia governors, over the course of 240 years, ignored this analogical basis for doing the same with respect to restoration orders-or for that matter, any order of pardon, reprieve, or commutation? We believe the reason why is because the federal pardon power is quite different from the Virginia restoration power. The United States Constitution does not provide, as a general rule of law, that felons are per se disqualified from voting, as does Article II, Section 1 of the Constitution of Virginia. Nor does the United States Constitution include an explicit anti-suspension provision similar to Article 1, Section 7 of the Constitution of Virginia, which strengthens the barriers against executive assertions of absolute power in defiance of generally applicable rules of law. These two provisions and our analysis of how they work in tandem applied to the facts of this case are noticeably missing from the federal context.
These dissimilarities stem, in part, from the fact that the first Constitution of Virginia was drafted in the midst of a War of Independence in opposition to a British monarch perceived as a tyrant. In contrast, the United States Constitution was drafted a decade later against a backdrop of years of governmental dysfunction due, in part, to the lack of a vigorous executive under the Articles of Confederation. In this respect, the constitutional seeds were thus planted in different soil. The clemency power of a Virginia Governor has historically been more circumscribed than the analogous powers of a United States President. In 1776, the Constitution of Virginia required the Governor to first consult with the Council of State before issuing a pardon and forbade any executive pardon contrary to laws enacted by the legislature. Va. Const. § 9 (1776). The Constitution of Virginia later imposed a reporting requirement. See Va. Const. art. V, § 12. Accordingly, federal practice with respect to the issuance of categorical, class-based pardons has no persuasive force with respect to the more limited power accorded to a Virginia Governor.

Recent practice lends support to this inference. See Governor Terence R. McAuliffe, List of Pardons, Commutations, Reprieves and Other Forms of Clemency, S. Doc. No. 2, at 16-495 (2014) (reporting individualized orders of "Restoration of Rights"); id. S. Doc. No. 2, at 5-649 (2015) (same); id. S. Doc. No. 2, at 23-366 (2016) (same). Likewise, the practice of Virginia Governors over 100 years ago also supports this inference. See, e.g., Governor William Hodges Mann, A List of Pardons, Commutations, Respites and Remission of Fines and Reasons Therefor, H. Doc. No. 9, at 43 (1912) (listing individualized orders for removal of political disabilities).

Although George Mason's first draft did not include the anti-suspension provision, it appeared in the committee draft without any clear indication of whether George Mason or some other member of the committee added it, and the provision was unanimously adopted by the convention in that form. See 1 A.E. Dick Howard, Commentaries on the Constitution of Virginia 90-91 (1974); 1 Papers of George Mason 1725-1792, at 276-78, 283-85, 288 (Robert A. Rutland ed., 1970).
Other states included similar constitutional provisions. The Delaware Declaration of Rights and Fundamental Rules of 1776 provided "[t]hat no Power of suspending Laws, or the Execution of Laws, ought to be exercised unless by the Legislature." 4 The Founders' Constitution 124 (Philip B. Kurland & Ralph Lerner eds., 1987). The Vermont Constitution of 1786 also declared "[t]he power of suspending laws, or the execution of laws, ought never to be exercised, but by the Legislature, or by authority derived from it, to be exercised in such particular cases only as the Legislature shall expressly provide for." Id.; see also Philip Hamburger, Is Administrative Law Unlawful? 529 n.33 (2014) (noting analogous provisions in the early Constitutions of Maryland, Massachusetts, New Hampshire, and North Carolina).

The ratification conventions in North Carolina and Rhode Island also recommended similar versions of the anti-suspension provision to be included in the post-ratification amendment process that ultimately produced the Bill of Rights to the United States Constitution. See Charles C. Tansill, Documents Illustrative of the Formation of the Union of the American States, H. Doc. No. 398, at 1045, 1053 (1927); Sources of Our Liberties: Documentary Origins of Individual Liberties in the United States Constitution and Bill of Rights 226 (Richard L. Perry ed., 1959).

As many commentators have noted, the Founders "felt themselves the heirs of the Revolution, of the glory derived from 1688. Americans of the 1770s felt they were approaching a 'centennial' of their own, reliving memories of the English Bill of Rights." Garry Wills, Inventing America: Jefferson's Declaration of Independence 64 (2002).

William Blackstone "constituted the preeminent authority on English law for the founding generation." District of Columbia v. Heller, 554 U.S. 570, 593-94, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (quoting Alden v. Maine, 527 U.S. 706, 715, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ). His Commentaries were "heavily" relied upon by the Founders. Akhil Reed Amar, America's Unwritten Constitution: The Precedents and Principles We Live By 7 (2012).

Justice Powell suggests that amici's assertion "is not bold, but rather, would seem to have been a widely accepted correct statement of Virginia law prior to the majority's decision." Post at 51-52, 788 S.E.2d at 734-35. In support, she cites In re Phillips, 265 Va. 81, 574 S.E.2d 270 (2003). This suggestion appears to imply that In re Phillips recognized amici's "widely accepted" assertion about the irrelevance of the anti-suspension provision. Not so. In re Phillips did not mention (not even in dicta) the anti-suspension provision. Nor did In re Phillips say anything about, much less rule upon, the role the anti-suspension provision plays as a constitutional check on the exercise of executive clemency powers.

We acknowledge that mandamus ordinarily will not issue unless petitioners show they have no adequate remedy at law. An injunction proceeding is not a legal remedy granted by a court of law but rather an equitable remedy issued by a chancery court. See James L. High, A Treatise on Extraordinary Legal Remedies § 20, at 26-27 (3d ed. 1896) (noting "that by a legal remedy, such as will bar relief by mandamus, is meant a remedy at law as distinguished from a remedy in equity"); Horace G. Wood, A Treatise on the Legal Remedies of Mandamus and Prohibition, Habeas Corpus, Certiorari, and Quo Warranto 41 (2d ed. 1891) (explaining that "the fact that a party may have relief in a Court of Equity is no reason why the [mandamus] writ should be denied"). This conclusion is logically inescapable given that an injunction generally cannot be issued if the claimant has an adequate remedy at law. See 2 Charles E. Friend & Kent Sinclair, Virginia Pleading & Practice § 33.02[4][b], at 33-49 (2d ed. 2007) ("The party seeking the injunction must also show that he or she has no adequate remedy at law.").
The Solicitor General points out that, pursuant to Code § 24.2-431, petitioners could file multiple law suits in applicable circuit courts seeking an order of cancellation based upon objections "to the registration of any person whose name is on the registration records for their county or city." This statutory cancellation remedy, however, would hardly be adequate enough to displace the need for mandamus relief. A remedy is "adequate" only if it is "equally as convenient, beneficial, and effective as the proceeding by mandamus." Cartwright v. Commonwealth Transp. Comm'r, 270 Va. 58, 64, 613 S.E.2d 449, 452-53 (2005) (quoting Carolina, Clinchfield & Ohio Ry. v. Board of Supervisors, 109 Va. 34, 37, 63 S.E. 412, 413 (1909) ). An adequate remedy "must reach the whole mischief, and secure the whole right of the party in a perfect manner, at the present time and in the future." McClaugherty v. McClaugherty, 180 Va. 51, 68, 21 S.E.2d 761, 768 (1942) (citation omitted). Moreover, "[c]onsideration must be given to the urgency that prompts the exercise of the discretion, the public interest and interest of other persons, the results that will occur if the writ is denied, and the promotion of substantial justice." Goldman, 262 Va. at 370-71, 552 S.E.2d at 70-71 ; see also Gannon v. State Corp. Comm'n, 243 Va. 480, 482, 416 S.E.2d 446, 447 (1992). Given the magnitude, scope, timing, and imprecision of Governor McAuliffe's Executive Order, we find no merit in the assertion that Code §§ 24.2-431 to -433 provides an adequate remedy at law for petitioners' claims.

We have affirmed the appropriateness of the mandamus remedy in election-law cases on appeal, see Wilkins, 205 Va. at 813-14, 139 S.E.2d at 856 ; Brown, 159 Va. at 47-48, 166 S.E. at 111, as well as in the context of mandamus actions involving what were ultimately held to be unlawful executive acts, see Jackson v. Hodges, 176 Va. 89, 101, 10 S.E.2d 566, 570 (1940) ; Fugate v. Weston, 156 Va. 107, 120, 157 S.E. 736, 740 (1931).

We decline petitioners' request for the issuance of writs of prohibition. Such writs are traditionally issued by "superior courts ... to the inferior courts, to restrain the latter from excess of jurisdiction." Burch v. Hardwicke, 64 Va. 51, 58 (1873) ; see also In re Commonwealth's Att'y for Roanoke, 265 Va. 313, 316-17, 576 S.E.2d 458, 461 (2003) ; Lee v. Jones, 212 Va. 792, 793, 188 S.E.2d 102, 103 (1972). Accordingly, "the writ issues from the superior court, 'directed to the judge and parties of a suit in any inferior court, commanding them to cease from the prosecution thereof, upon the suggestion that [the matter] does not belong to that jurisdiction, but to the cognizance of some other court.' " Burch, 64 Va. at 59 (quoting 3 William Blackstone, Commentaries *112); see also High, supra note 17, § 762, at 705-06 (defining the writ of prohibition as "an extraordinary judicial writ, issuing out of a court of superior jurisdiction and directed to an inferior court, for the purpose of preventing the inferior tribunal from usurping a jurisdiction with which it is not legally vested").