PRESENT: All the Justices

CITY OF HAMPTON

v. Record No. 210988

OPINION BY
JUSTICE CLEO E. POWELL
JUNE 8, 2023

REESE WILLIAMSON

FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Michael A. Gaten, Judge

The City of Hampton (the "City") appeals the circuit court's decision to grant a petition for a writ of mandamus. This case turns on whether Code § 15.2-1507(A)(10)(b)(3) establishes an extensive discovery mechanism for a grievant prior to a grievance panel hearing. For the reasons set forth below, we hold that it does not.

## I. BACKGROUND

Reese Williamson ("Williamson") served as a firefighter with the City from 2002 to 2020. On June 1, 2020, Williamson made a remark while watching a recap of the nightly news with a colleague. Another firefighter, who was not present at the time, learned of Williamson's comment and interpreted it as offensive and racist. Although Williamson claims that he apologized to that firefighter, he was subsequently terminated for purportedly violating the personnel manual, harassing behavior, dealing with citizens and other employees in a rude or disrespectful manner, making inflammatory statements, and engaging in behavior offensive to the City's residents.

Williamson availed himself of the City's grievance procedures, believing that his termination was a result of a "letter-writing campaign to smear" his reputation. Williamson progressed through the several steps of the grievance process, eventually reaching the fourth and

final step – a grievance panel hearing. Prior to the scheduled hearing, Williamson requested that the City produce "all correspondence in any form received by the City from any source which addresses the conduct charged against Mr. Williamson in connection with this action." Williamson later clarified his request to the City, asking that it produce "all correspondence, emails, or texts" received by "any city employee from any source complaining about the statement Mr. Williamson allegedly made which forms the basis for this disciplinary action," and "any document which formed the basis for the disciplinary action" against Williamson.

The City informed Williamson that it did "not intend to use any documents" he requested and provided him with a list of witnesses it intended to call and a grievance binder that included the documents that had been furnished to the grievance panel. The City acknowledged to Williamson that it was withholding 17 pages of documents that might be responsive to his request. The next day, the City informed Williamson that it would not use any documents or exhibits at the grievance panel hearing, intending only to rely on the testimony of witnesses whose names had already been provided.

Williamson sought a writ of mandamus in the circuit court, requesting it to compel the City to comply with Code § 15.2-1507(A)(10)(b)(3) and provide him with access to and copies of the requested documents in the City's possession. The City demurred, contending that it had complied with any ministerial duty imposed by the statute. At a subsequent hearing, the circuit court concluded that the statute should be read "liberally" and determined that Williamson was entitled to all of the relevant documents he requested under seal. The circuit court entered an order memorializing its ruling, ordering that the City "provide the materials requested by the Petitioner, specifically the 17 pages of correspondence previously withheld by the Respondent."

The City appeals.

## II. ANALYSIS

On appeal, the City argues that the circuit court erred in granting the writ of mandamus, claiming that Code § 15.2-1507(A)(10)(b)(3) does not require it to furnish documents to a grievant if it does not intend to use those documents in the grievance proceeding.[1] Williamson takes the position that the statute expressly grants him access to relevant files possessed by the City that are intended to be used by either party.

To determine whether a writ of mandamus lies here, we are tasked with construing Code § 15.2-1507(A)(10)(b)(3). Since the determination whether a writ of mandamus is an appropriate remedy and the interpretation of a statute are questions of law, we review the circuit court's decision de novo. *Moreau v. Fuller*, 276 Va. 127, 133 (2008); *John C. Holland Enterprises, Inc. v. Southeastern Pub. Serv. Auth. of Virginia*, 273 Va. 716, 720 (2007).

"Mandamus is an extraordinary remedy employed to compel a public official to perform a purely ministerial duty imposed upon him by law." *Richlands Med. Ass'n v. Commonwealth*, 230 Va. 384, 386 (1985). To compel performance of a purely ministerial duty, there must be no other adequate remedy at law and "a clear and unequivocal duty imposed by law upon the officer to perform the act." *May v. Whitlow*, 201 Va. 533, 537 (2008). We have explained that "[a] ministerial act is 'one which a person performs in a given state of facts and prescribed manner in obedience to the mandate of legal authority without regard to, or the exercise of, his own

---

[1] The City initially asserts that the only ministerial duty created by Code § 15.2-1507(A)(10)(b)(3), if any, is that it must adopt the rules as expressed in the statute. The City, however, concedes that its grievance procedures mirror the required provisions outlined in the statute. The City must abide by those legally enforceable provisions. Accordingly, the analysis of whether Code § 15.2-1507(A)(10)(b)(3) imposes a ministerial duty does not end with the official adoption of the statutorily-mandated procedures.

judgment upon the propriety of the act being done.'" *Richlands Med. Ass'n*, 230 Va. at 386. Simply put, mandamus does not lie to compel a public official to perform a discretionary act.

As a preliminary matter, Code § 15.2-1506 mandates that each locality in Virginia with "more than fifteen employees shall have a grievance procedure for its employees." The various components and features that must be included in the grievance procedures are primarily outlined in Code § 15.2-1507. One component is the requirement that "qualifying grievances" should advance to a panel or administrative hearing. Code § 15.2-1507(A)(10)(a). Another component is the requirement that localities "shall adopt rules for the conduct of panel or administrative hearings as a part of their grievance procedures," and those rules "shall include" various provisions. Code § 15.2-1507(A)(10)(b). One such provision is Code § 15.2-1507(A)(10)(b)(3), which requires

> [t]hat the local government provide the panel or hearing officer with copies of the grievance record prior to the hearing, and provide the grievant with a list of the documents furnished to the panel or hearing officer, *and the grievant and his attorney, at least 10 days prior to the scheduled hearing, shall be allowed access to and copies of all relevant files intended to be used in the grievance proceeding*[.]

(Emphasis added.)

By its plain language, Code § 15.2-1507(A)(10)(b)(3) requires a locality to furnish certain materials to the panel or hearing officer. It further provides that the locality "shall" allow the grievant access to certain files in advance of a grievance proceeding. The inclusion of the word "shall" indicates that the production is obligatory, not discretionary. *See* Black's Law Dictionary 1653 (11th ed. 2019) ("shall" means "[h]as a duty to; more broadly, is required to"). Accordingly, since a locality is obligated to produce certain documents in advance of a grievance proceeding, a ministerial duty exists.

4

The scope of the City's obligation hinges on the interpretation of the latter portion of the operative provision, which mandates that a grievant be allowed "access to and copies of all relevant files intended to be used in the grievance proceeding." Code § 15.2-1507(A)(10)(b)(3). The phrasing raises the question – intended to be used by whom? The answer, in our view, is the locality.

"When construing a statute, our primary objective is to ascertain and give effect to legislative intent, as expressed by the language used in the statute." *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012) (citation and internal quotation marks omitted). "To best ascertain that intent, when the language of a statute is unambiguous, we are bound by the plain meaning of that language." *Blake v. Commonwealth*, 288 Va. 375, 381 (2014) (alteration and internal quotation marks omitted). "Although our focus is generally on the plain meaning of unambiguous statutory language, we must also consider that language in the context in which it is used." *Potter v. BFK, Inc.*, 300 Va. 177, 182 (2021).

The logical conclusion of Williamson's argument is that Code § 15.2-1507(A)(10)(b)(3) creates a one-way discovery mechanism for grievants, applicable prior to a grievance panel hearing. Thus, to better elucidate the plain meaning of the statute and the context in which it is used, an understanding of discovery is necessary. The word "discovery" connotes finding something that one previously did not know existed, as it "is the process by which facts resting within the knowledge of one party are disclosed to another party in a suit or proceeding in court." *Temple v. Mary Washington Hosp., Inc.*, 288 Va. 134, 140 (2014). Discovery serves as an effective tool because it enables parties "to obtain evidence in the sole possession of one party and unobtainable by opposing counsel through independent means." *Rakes v. Fulcher*, 210 Va. 542, 545 (1970). This tool often encourages settlement, "reduce[s] the issues so as to shorten

time consumed in trial and . . . prevent[s] surprise." *City of Portsmouth v. Cilumbrello*, 204 Va. 11, 14 (1963). Because of these benefits, discovery is typically a mechanism that both parties are able to utilize. *See Wardius v. Oregon*, 412 U.S. 470, 475 (1973) ("[I]n the absence of a strong showing of state interests to the contrary, discovery must be a two-way street.").

However, there is no common law right to discovery. Ronald J. Bacigal & Corrina Barrett Lain, Va. Prac. Crim. Procedure § 14:2 (2022-2023 ed.); *Rex v. Holland*, 100 Eng. Rep. 1248 (1792). Nor is there a general constitutional right to discovery. *Lowe v. Commonwealth*, 218 Va. 670, 679 (1977) ("There is no general constitutional right to discovery in a criminal case."); *Gunter v. Virginia State Bar ex rel. Seventh Dist. Comm.*, 241 Va. 186, 190 (1991) ("If '[t]here is no general constitutional right to discovery in a criminal case,' there is none in a civil case.") (citation omitted). Although due process does require, in criminal cases, that the prosecution disclose exculpatory evidence to the accused, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), this requirement has not been extended to administrative hearings. *See Gunter*, 241 Va. at 190 (noting that an attorney does not have a "procedural due process right to discovery in a disciplinary proceeding"); *see also Detweiler v. Commonwealth Dept. of Rehab. Servs.*, 705 F.2d 557, 560 (4th Cir. 1983) ("Provision for compulsory process for witnesses is not an essential element of due process at an employee's grievance hearing.").

Against this backdrop, it is apparent that Code § 15.2-1507(A)(10)(b)(3) does not impose a full-scale discovery obligation. Instead, this subsection defines a fairly limited opportunity for a grievant to obtain materials from the locality. Specifically, a locality must (1) give copies of the grievance record to the panel or hearing officer, (2) provide the grievant with a list of the documents given to the panel or hearing officer, and (3) allow the grievant "access to and copies of" relevant files intended to be used in the proceeding. *Id.* Each enumerated obligation is

6

imposed upon the locality for the benefit of the grievant. The absence of an explicit reciprocal obligation upon the grievant necessarily implies that, apart from the limited opportunity discussed below, discovery is not part of this statutory scheme.

The absence of a discovery obligation is further supported by a comparison to the state's grievance procedure found in Code § 2.2-3000 *et seq*. It is worth noting that "[a]t times we consider statutes relating to the same subject matter to help provide meaning to the statute before us." *Dowling v. Rowan*, 270 Va. 510, 519 (2005). It is evident that these two statutory schemes relate to the same subject matter – the establishment of grievance procedures. Furthermore, the state's grievance procedure is specifically referenced in Code § 15.2-1507. It serves to provide default provisions for localities who "fail[] to adopt a grievance procedure required by Code § 15.2-1506 or fail[] to certify it as provided" in the statute. Code § 15.2-1507(A). Accordingly, reviewing Code § 2.2-3003(E) is informative. Code § 2.2-3003(E) explicitly states that

> [a]bsent just cause, all documents, as defined in the Rules of the Supreme Court of Virginia, relating to the actions grieved shall be made available, upon request from a party to the grievance, by the opposing party, in a timely fashion. Upon such a request a party shall have a duty to search its records to ensure that all such relevant documents are provided.

The difference in language between the related statutes is quite telling. Code § 2.2-3003(E) demonstrates that when the General Assembly intends to create a full-fledged discovery mechanism, it knows how to do so. The General Assembly's use of different language in Code § 15.2-1507(A)(10)(b)(3) indicates that it did not intend to establish an extensive discovery mechanism for grievants in local grievance matters. *See Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011) ("[W]hen the General Assembly has used specific language in one instance but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was

7

intentional."). *See also Morgan v. Commonwealth*, 301 Va. ___, 881 S.E.2d 795, 799 (2022) (explaining that "Courts must rely on this presumption because under these circumstances, it is evident that the General Assembly knows how to include . . . language in a statute to achieve an intended objective, and therefore, omission of such language in another statute represents an unambiguous manifestation of a contrary intention.") (internal quotation marks omitted) (quoting *Brown v. Commonwealth*, 284 Va. 538, 545 (2012) and *Halifax Corp. v. Wachovia Bank*, 268 Va. 641, 654 (2004)). Therefore, we conclude that the lack of a discovery mechanism supports the City's interpretation that it is only required to produce the documents that it intends to use in the grievance procedure.

Even under Williamson's interpretation, Code § 15.2-1507(A)(10)(b)(3) only permits him "access to and copies of all relevant files *intended to be used in the grievance proceeding*." (Emphasis added.) The "intent to use" a file presupposes a knowledge of both its existence and its content. As a practical matter, without knowing the content even of pages identified by a locality as being "potentially responsive," a grievant could not know which of those files he intended to use at the grievance proceeding. Similarly, the locality could not know which files the grievant intended to use. Therefore, the only workable interpretation of the "intended to be used" language is that a locality is obligated to produce the documents that it intends to use.

A contrary interpretation would enable a grievant to engage in an unwarranted fishing expedition, a tactic we disapprove of. *See Hedrick v. Warden of the Sussex I State Prison*, 264 Va. 486, 522 (2002) ("[A] habeas corpus petitioner is not allowed to embark upon a 'fishing expedition' of the Commonwealth Attorney's files."). Moreover, as the present case demonstrates, such a fishing expedition would create a legal paradox. By casting a wide net, Williamson would likely receive files that he might use at the grievance proceeding. At the same

8

time, it is equally likely that he would also receive files that he would not use.[2] As Williamson is clearly not entitled to the latter type of files, Code § 15.2-1507(A)(10)(b)(3) cannot logically be interpreted in a manner that would lead to such a result. At best, the grievant might be allowed "access to and copies of" files produced by the City in the grievance record, plus any additional files not included in the grievance record but intended to be used by the City at the hearing. To the extent that this is a broader view than that espoused by the City, this view was complied with in this case.

Williamson attempts to bolster his argument by insisting that Code § 15.2-1507(A)(10)(b)(3) be read *in pari materia* with Code § 15.2-1507(A)(10)(b)(4). Specifically, he argues that because subsection (b)(4) provides for a "full and equal opportunity" to present evidence at the hearing, then the (b)(3) subsection must provide for a discovery procedure. Again, we disagree. Code § 15.2-1507(A)(10)(b)(4) applies to the conduct of the panel hearing. While it does provide for the full and equal opportunity to present evidence, it has no bearing on the source of that evidence. It affirms the notion that these proceedings do not have to mirror those of a court proceeding as it relates to burdens of proof and an orchestrated presentation of evidence.

We acknowledge that this may, at times, lead to unfair practices.[3] A locality, however, still must satisfactorily demonstrate the rationale behind its employment decision. If a locality declines to utilize files it may have actually relied upon in making an employment decision, that

---

[2] For the sake of argument, even if Williamson's requests are considered limited, his interpretation of the statute does not preclude future grievants from initiating broad, one-way discovery requests, all under the guise that they "intend to use" those documents at the grievance hearing.

[3] For example, a locality with exculpatory evidence would not be required to produce this evidence to a grievant if it did not intend to use it at the hearing.

is its prerogative. Consequently, the locality risks not being able to persuade the panel or hearing officer that its decision was justified. Moreover, a grievant's inability to access all of a locality's files does not dictate a losing outcome because "[t]he grievance procedures presuppose that the grievant will have evidence to support his position." *Burdeau v. Trustees of California State Colleges*, 507 F.2d 770, 775 (9th Cir. 1974).

Turning to this case, Williamson availed himself of the post-termination proceedings that he is entitled to by progressing through the City's grievance procedures. In preparation for the final step, the grievance hearing, the City provided Williamson with its list of witnesses and a grievance binder with the documents furnished to the grievance panel. Regardless of whether the City intends to use the documents in the grievance binder, as it originally suggested, or rely solely on witness testimony, it has clearly met its obligation under Code § 15.2-1507(A)(10)(b)(3). Thus, mandamus does not lie.

## III.  CONCLUSION

For the foregoing reasons, the circuit court erred in granting the writ. Accordingly, the circuit court's judgment is reversed, and the petition for a writ of mandamus is dismissed.

*Reversed and final judgment.*

JUSTICE KELSEY, with whom JUSTICE CHAFIN joins, dissenting.

Code § 15.2-1507(A)(10)(b)(3) states that "the grievant and his attorney . . . shall be allowed access to and copies of all relevant files intended to be used in the grievance proceeding."  Reversing the circuit court, the majority construes the statute to say that "the grievant and his attorney . . . shall be allowed access to and copies of all relevant files intended to

10

be used ^*by the City, but not by the grievant,*^ in the grievance proceeding." But the statute does not say that. Perhaps so, the majority responds, but the context of the statute requires that we read it that way. I think just the opposite is true.

## I.

Lieutenant Reese Williamson worked as a supervisory firefighter for the City of Hampton and had been with the Hampton Division of Fire and Rescue for 18 years. One evening, Lt. Williamson and a fellow supervisory firefighter watched a news program reporting on a violent attack on firefighters in another city who were attempting to extinguish burning buildings and cars lit on fire by protestors. The protesters pelted the firefighters with Molotov cocktails, rocks, bricks, and bottles. Finding themselves defenseless, the firefighters used their fire hoses to push the violent mob away from the scene in order to continue fighting the fires.

While watching the news program, Lt. Williamson and his colleague discussed what they might do if they were to find themselves in such a situation. During that conversation, Lt. Williamson said, "I would only do that if ordered to." J.A. at 3. Lt. Williamson forthrightly admits that he made that remark and stands by it. The remark "was predicated solely in the context of the previous night's news coverage," which as Lt. Williamson points out, "depicted protesters violently attacking unarmed and unprotected firefighters who were attempting to extinguish fires set by those protesters, and who, lacking any other means of protection, utilized fire hoses as non-lethal means of self-defense from ongoing violent attack and injury." *Id.* at 3 n.1.

Sometime later, one of Lt. Williamson's subordinates, Tracey Williams, learned about Lt. Williamson's remark. When Lt. Williamson heard that his remark had offended Williams, Lt. Williamson personally apologized "for any unintended offense that remark [had] caused." *Id.* at

11

3. Despite the apology and the fact that Williams had not personally heard the remark nor had been present during the conversation, he "engaged in a campaign of letter writing to Hampton's Fire Chief, to the City Manager, and to others attacking Lt. Williamson as a racist for making this comment." *Id.* at 4. The campaign, Lt. Williamson believed, was "a calculated effort to have [him] terminated from the Fire Department." *Id.* at 5.

In response, the City "opened up an EEO investigation" and obtained accusatory letters and statements from "employees" and "witnesses." *Id.* at 52. Relying upon these documents, the City ended Lt. Williamson's 18-year career as a firefighter with the City. After he was fired, "Lt. Williamson came into possession of a series of draft letters, apparently written by Firefighter Williams, which reflect Williams'[s] effort to undertake a letter-writing campaign to smear Lt. Williamson's reputation and to label him as a racist." *Id.* at 5.

The City does not deny this characterization of what happened. To be sure, the City concedes that the EEO documents included "statements and complaints from fellow employees" accusing Lt. Williamson of "harassing or discriminatory behavior." Oral Argument Audio at 4:33 to 4:45. The City reviewed the EEO investigator's report, the letters, and written witness statements obtained during the investigation. These documents "were considered as part of the City's determination as to whether an EEO violation had occurred and whether to terminate Mr. Williamson." *Id.* at 2:48 to 3:00.[1] In short, the City admits that it "did use those documents or

[1] An EEO investigation examines alleged violations of equal employment opportunity law, including the nondiscrimination provisions of Title VII of the Civil Rights Act of 1964 and the Virginia Human Rights Act. *See* 42 U.S.C. §§ 2000e-2, 2000e-8 (outlining Title VII's nondiscrimination provisions and procedures following the filing of a complaint); 29 C.F.R. §§ 1601.7, 1601.15 (requiring the investigation of a charge alleging a violation of Title VII's nondiscrimination provisions); Code § 2.2-3907 (outlining the procedures for an investigation of discrimination under the Virginia Human Rights Act); 1 VAC §§ 45-20-30, -55, -80 (regulating state procedures for investigating a discrimination complaint and cooperating with the federal EEOC and other federal agencies).

12

essentially the report of the [EEO] investigator which referenced those documents to make the determination" to fire Lt. Williamson. *Id.* at 4:49 to 5:00; *see also id.* at 11:32 to 11:37 (acknowledging that the statements were "certainly taken into account").

The termination notice from the Fire Chief stated, among other things, that Lt. Williamson had engaged in unspecified "[h]arassing behavior" and had made various unidentified "inflammatory statements," J.A. at 4, not simply one isolated remark. None of the "statements and complaints from fellow employees" accusing Lt. Williamson of "harassing or discriminatory behavior," Oral Argument Audio at 4:33 to 4:45, "have [ever] been substantively disclosed to Lt. Williamson in any form," J.A. at 5. From Lt. Williamson's perspective, he was fired not because of a single remark to a colleague in a private conversation but because he had been accused of being a racist by Williams (and anonymous others) in undisclosed allegations upon which the City had concededly relied.

During the City's grievance process, Lt. Williamson's counsel requested access to the accusatory letters and witness statements upon which the City had based its decision. In response, the City assured counsel that there were "several character letters that will be included in the grievance binder." *Id.* at 13. The City also confirmed that "[w]itness statements will also be included in that binder." *Id.* Lt. Williamson's counsel then specifically asked for any documents (regardless of whether they were included in the grievance binder) that "formed the basis for the disciplinary action taken against [Lt.] Williamson." *Id.*

A few days later, Lt. Williamson's counsel received the grievance "binder" that the City had earlier promised to send. *Id.* at 17. The grievance binder did not include any of the letters or witness statements that the City had earlier stated would be in it. In an email, Lt. Williamson's counsel asked the City: "To be clear: do such documents exist, and if so, are they being

13

purposefully withheld from us?" *Id.* The City promptly responded affirmatively to both questions and then explained why it would not allow Lt. Williamson or his counsel to see these documents.

The City claimed that these documents were exempt from the Virginia Freedom of Information Act, Code § 2.2-3705.3(3), and that nothing in the City's grievance policy required the City to provide these documents. "Accordingly," the City stated, "we are withholding 17 pages which may be responsive to your request but are subject to the above exemption." J.A. at 15. In the same letter, the City also advised Lt. Williamson's counsel that the City intended to call Williams and two other firefighters as witnesses at the evidentiary hearing before the citizen grievance panel. The letter continued: "The City may use any documents contained in the *grievance binder* during the grievance." *Id.* (emphasis added). No mention was made, however, of the City's earlier representation that the letters and witness statements that Lt. Williamson had requested were to be included in the "grievance binder." *Id.* at 13. And the City offered no response to the "stated intention" of Lt. Williamson's counsel "to use those documents at the time of his grievance panel hearing," *id.* at 8, for cross-examination of the City's designated witnesses, including Williams, *see id.* at 10.

Asserting that the City had a nondiscretionary statutory duty to provide these documents to him prior to the hearing, Lt. Williamson filed a mandamus petition in circuit court. Lt. Williamson relied on Code § 15.2-1507(A)(10)(b)(3), which states in pertinent part that a "grievant and his attorney . . . shall be allowed access to and copies of all relevant files intended to be used in the grievance proceeding." Lt. Williamson's counsel argued that the requested documents (particularly Williams's letters and statements) were clearly "relevant" because the City had based its termination decision on them and because the City had intended to call

14

Williams as a witness to support this decision. J.A. at 56-61. And if the City were to decide not to call Williams as a witness, Lt. Williamson's counsel stated, "I intend to call [Williams] because I think that what he started is relevant to what happened to my client." *Id.* at 58. Lt. Williamson's counsel did not recite any admissibility rules that authorized his intended use of these documents at the grievance hearing. He did not need to do so. Because grievance hearings "are not intended to be conducted like proceedings in courts," the technical requirements of formal "rules of evidence do not necessarily apply." Code § 15.2-1507(A)(10)(b)(9).

In response, the City made several arguments. It first claimed that Code § 15.2-1507(A)(10)(b)(3) only required that the City provide Lt. Williamson with pre-hearing access to documents that the City intended to use at the grievance hearing. The City then walked back its earlier representations to Lt. Williamson's counsel that the "grievance binder" would include "several character letters" and "[w]itness statements." J.A. at 13. Lt. Williamson may be entitled to access the "grievance record," the City clarified, but the grievance record did not include, nor was it supposed to include, any of these documents. *Id.* at 19.[2]

---

[2] I question the City's about-face on this issue. In the circuit court, the City conceded "that its grievance procedures mirror the required provisions outlined in the statute." *Ante* at 3 n.1; *see also* J.A. at 23, 53. But on appeal, the City's briefs never mention any of its written grievance procedures. I think I know why. "A copy of the *grievance file*," the City's policy states, "shall be provided to the panel members," and the grievant "shall" be provided with the "list of the documents furnished to the panel." City of Hampton, *Grievance Procedures*, *in* Personnel Policies Manual ch. 3, at 15 (2017) (emphasis added), https://hampton.gov/Document Center/View/850/3---Grievance-Procedures?bidId=. The policy recognizes that the City has an obligation to maintain "Grievance Records" and defines these records as containing all documents in the "grievance case *file*." *Id.* at 19 (emphasis added). This grievance file "shall contain copies of *all* forms, memoranda, letters, waivers, and/or summaries of all meetings and decisions rendered *concerning the case*." *Id.* (emphases added). To avoid any confusion on the issue, the policy clarifies that the grievance file includes "all additional data" related to the case as it "progresses through the various steps of the grievance procedure." *Id.* Put simply, the City's own grievance policy treats "grievance file" and grievance record" as synonymous concepts.

The City completed its argument by pointing out that a writ of mandamus can be issued only to enforce a ministerial statutory duty. Because the City had no duty at all (much less a ministerial one) to produce the requested documents, mandamus could not lie as a matter of law. And even if a ministerial duty arguably did exist, the public policy of the Commonwealth required that the documents remain "confidential." *See id.* at 52-53. The bottom line, the City argued, is that the City has to provide a grievant with access to "documents that *the City* is going to put on in its case," *id.* at 60 (emphasis added), not documents intended to be used by the grievant during cross-examination of the City's witnesses or to be offered by the grievant in his case-in-chief.

The circuit court rejected the City's argument. Stopping short of finding a constitutional due-process violation, the court based its holding solely on a "statutory due process" violation of Code § 15.2-1507(A)(10)(b)(3). *See* J.A. at 63-64. Whether Lt. Williamson should have been fired, the court made clear, was not the issue before the court. "That's up to the citizen's panel to decide." *Id.* at 63. The court's final order specifically identified "17 pages" of documents that were responsive to Lt. Williamson's request but wrongfully withheld by the City. *Id.* at 71. The court ordered that these documents be provided to Lt. Williamson and "placed under seal" to protect potential "privacy interest[s]." *Id.* at 63-64.

II.

On appeal, Lt. Williamson argues that the circuit court correctly read the text of the statute and understood how it fit within the larger legal context. He also contends that the "shall" mandate in the statute imposes a ministerial, not discretionary, duty on the City to produce the requested documents and that no public policy precluded the circuit court from issuing the writ of mandamus to enforce that duty. I agree with Lt. Williamson on both points.

16

A.

1.

For a long time, public employees could be fired for a good reason, a bad reason, or for no reason at all. Over time, however, courts debated whether a public employee's contractual right to continued employment (if that is what the public employee truly had) was an intangible form of property and thus could not be taken away by the government without some measure of due process. *See Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-78 (1972). In the seminal decision, *Cleveland Board of Education v. Loudermill*, the United States Supreme Court acknowledged the debate and said, "If a clearer holding is needed, we provide it today." 470 U.S. 532, 541 (1985). *Loudermill* held that a for-cause employee is constitutionally entitled to "some kind of a hearing" before being fired, *id.* at 542 (quoting *Board of Regents of State Colls.*, 408 U.S. at 569-70 & n.7; *Perry v. Sindermann*, 408 U.S. 593, 599 & n.5 (1972)), and to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story," *id.* at 546. After being fired, the employee is entitled to fair "post-termination administrative procedures." *Id.* at 547-48; *see also Gilbert v. Homar*, 520 U.S. 924, 929 (1997).

This constitutional imperative is the reason for the statutory procedures protecting public employees in Virginia. Seeking to satisfy the demands of due process, the General Assembly in 1973 directed localities to adopt grievance procedures to address employee disputes. *See* 1973 Acts ch. 256, at 326-27. The stated purpose of the Act was to require localities to provide an "immediate and fair method" of resolving grievances. *See id.* at 326 (codifying former Code § 15.1-7.1, the predecessor statute to current Code § 15.2-1506). Toward this end, Code § 15.2-1507(A)(10)(b) directs localities to promulgate "rules for the conduct of panel or administrative

17

hearings." While the locality can wordsmith these rules however it chooses, the statute sets several baselines that the locality's rules "shall include." Code § 15.2-1507(A)(10)(b). One baseline is

> [t]hat the local government provide the panel or hearing officer with copies of the grievance record prior to the hearing, and provide the grievant with a list of the documents furnished to the panel or hearing officer, *and* the grievant and his attorney, at least 10 days prior to the scheduled hearing, *shall* be allowed access to and copies of all relevant files intended to be used in the grievance proceeding . . . .

Code § 15.2-1507(A)(10)(b)(3) (emphases added).

The second dependent clause of Code § 15.2-1507(A)(10)(b)(3) governs this case. The character letters and witness statements were "relevant" documents because the City relied on them as a basis for firing Lt. Williamson. *See* Oral Argument Audio at 2:48 to 3:00, 4:49 to 5:00, 11:32 to 11:37. The City stated that it would call Williams and two other firefighters as witnesses at the panel grievance hearing. And if the City chose not to call Williams as a witness, Lt. Williamson's counsel made clear that he would call him as an adverse witness. Finally, Lt. Williamson's counsel requested these documents because he intended to use them to cross-examine Williams and the other designated witnesses. It necessarily follows that under the "shall" command in the second dependent clause of Code § 15.2-1507(A)(10)(b)(3), Lt. Williamson and his counsel should have been "allowed access to and copies" of these highly relevant documents.

The City argues that my reading of the second dependent clause of Code § 15.2-1507(A)(10)(b)(3) is overly literal. The context of the entire subsection, the City claims, requires that we construe the second dependent clause to say that the grievant "shall be allowed access to and copies of all relevant files intended to be used ^*by the City, but not by the grievant,*^ in the grievance proceeding." Code § 15.2-1507(A)(10)(b)(3) (adding careted insert).

18

According to the City, its interpolation merely makes clear what was true (albeit ambiguously silent) all along: The grievant has no right to see a document that the City relied upon as a basis for firing him if the City decides not to use the requested document at the grievance hearing.

My colleagues in the majority reluctantly accept the City's view. Even though it may "lead to unfair practices," the majority concludes, the legislature apparently intended to grant local governments the "prerogative" to engage in such practices. *See ante* at 9-10. I find that hard to believe. The General Assembly articulated the proper context for Code § 15.2-1507 by requiring in Code § 15.2-1506 that the City provide an "immediate and fair method" for resolving grievances. The animating constitutional context, moreover, requires the government to give a tenured employee "oral or written notice of the charges against him, an explanation of the employer's evidence, . . . an opportunity to present his side of the story," and fair "post-termination administrative procedures." *Loudermill*, 470 U.S. at 546-48. As is true to all discussions of procedural due process, the ultimate "touchstone" is "fundamental fairness," *Walker v. Forbes*, 292 Va. 417, 423 (2016) (citation omitted), an ancient aspiration "whose meaning can be as opaque as its importance is lofty," *Lassiter v. Department of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 24 (1981); *see also Breithaupt v. Abram*, 352 U.S. 432, 436 (1957).

How could it be fair for the government to fire an employee based on anonymous accusations of a pattern of "[h]arassing behavior" and various "inflammatory statements," J.A. at 4, and then refuse to tell the fired employee who his accusers were and what they accused him of saying or doing? Even more difficult to answer, how could it be fair to put the chief accuser on the witness stand without giving the fired employee an opportunity to cross-examine him with his prior statements?[3] If the statute is meant to provide an "immediate and fair method" of

---

[3] We took this line of questioning to its logical extreme during oral argument: "If the

resolving a grievance, Code § 15.2-1506, I do not see how the City's contextual argument

supports its reading of Code § 15.2-1507(A)(10)(b)(3).

2.

Seeking support elsewhere, the majority relies on a canon of construction historically

known as expressio unius est exclusio alterius. The majority concludes that the "difference in

language" between Code § 15.2-1507(A)(10)(b)(3), which governs local government employees,

and Code § 2.2-3003(E), which governs state employees, "indicates that [the legislature] did not

intend to establish an extensive discovery mechanism for grievants in local grievance matters."

*Ante* at 7. Because the General Assembly knew how "to create a full-fledged discovery

mechanism" with the language it used in Code § 2.2-3003(E), the "lack of a discovery

mechanism" in Code § 15.2-1507(A)(10)(b)(3) "supports the City's interpretation that it is only

required to produce the documents that it intends to use in the grievance procedure." *Ante* at 7-8.

"A contrary interpretation," the majority warns, "would enable a grievant to engage in an

unwarranted fishing expedition." *Ante* at 8.

The problem with this logic is that although its first premise is true, the majority's

conclusion does not follow from it. We all agree that the General Assembly's use of more

specific language in the state grievance statute is intentional and that its "full-fledged discovery

mechanism," *ante* at 7, should not be imported to the locality grievance statute. I am not

suggesting that it should be. What litigators call "full-fledged discovery" is just that — a wide-

_____

City had a document that absolutely, positively guaranteed that [Lt. Williamson] would have
won his case, but the City decided not to use [the withheld document], he would never get it
under this particular statutory scheme, is that correct?" Oral Argument Audio at 1:11 to 1:33.
"That would be our position," the City's counsel stated, "if we just chose not to use that
document." *Id.* at 1:34 to 1:40. I respect the consistency of counsel's answer but disagree with
the flawed premise underlying it.

20

open effort to discover anything and everything arguably relevant to the case, regardless of whether you intend to use it at an evidentiary hearing. Nothing in the locality grievance provision comes close to that. Under Code § 15.2-1507(A)(10)(b)(3), a local government employee has access *only* to documents that are *intended to be used* at the grievance hearing. If neither side intends to use the documents at the hearing, they are not discoverable.

The "expressio unius est exclusio alterius" doctrine, more easily remembered as the "negative-implication" canon, Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107-11 (2012), has no application to this scenario. When properly applied to two different statutes within the same category of law, the doctrine operates no differently than when it applies to an interpretative question within a single statute. A single statute that specifically mentions only X, Y, and Z can be reasonably presumed (though subject to rebuttal) to exclude A, B, or C.[4] Applying the doctrine to different statutes, we can similarly presume that the mention of X, Y, and Z in a broad statute implies that Z is excluded in a narrower statute that addresses only X and Y. We have many examples in Virginia law doing just that.[5] But we have no cases endorsing the fallacy that a broad statute addressing X, Y, and Z implies that a narrower statute cannot possibly address X alone.

---

[4] *See, e.g.*, *Stoots v. Marion Life Saving Crew, Inc.*, 300 Va. 354, 365-66 (2021) (finding that the exclusion of an exception for gross negligence in a good-faith requirement in one subsection implied that gross negligence could not be equated with bad faith when another subsection in the same statute included an exception for gross negligence to the good-faith requirement); *In re Brown*, 295 Va. 202, 223-24 (2018) (finding that the express reference to test results completed by the Department of Forensic Science in the actual-innocence-testing statute implies that test results from private laboratories cannot be considered).

[5] *See, e.g.*, *Fines v. Rappahannock Area Cmty. Servs. Bd.*, 301 Va. 305, ___, 876 S.E.2d 917, 925 (2022) (finding that the General Assembly did not intend to create community service boards as bodies corporate and politic when they are defined as a mere "public body" in comparison to behavioral health authorities that are defined by the General Assembly in a separate statute as both "a public body and a body corporate and politic"); *Williams v. Matthews*, 248 Va. 277, 283-84 (1994) (finding that the General Assembly's omission of an express

21

The state grievance statute is a broadly worded statute authorizing plenary discovery, and the locality grievance statute is a narrowly worded statute authorizing limited discovery. Under the negative-implication canon, the availability in a state grievance proceeding of "full-fledged discovery" at the level of a "fishing expedition," *ante* at 7-8, would shut down any attempt to interpret the limited language of the locality grievance statute to do the same. But Lt. Williamson is not arguing for that interpretation, and I would not accept the argument if he had made it.

The unavailability of plenary discovery, which is available only to state employees, is no reason for denying limited discovery to local government employees. The negative-implication canon "properly applies only when the *unius* (or technically, *unum*, the thing specified) can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved." Scalia & Garner, *supra*, at 107 (emphases in original). The canon does not apply to matters that "go beyond the category to which the negative implication pertains." *Id.* at 108.

To understand the relationship of the state grievance statute to the locality grievance statute, the more apt interpretative canon is the "cardinal rule of construction that statutes dealing with a specific subject must be construed together in order to arrive at the object sought to be accomplished." *Prillaman v. Commonwealth*, 199 Va. 401, 406 (1957) (citation omitted). Known as the in pari materia rule, this canon of construction applies only when the statutes are "not inconsistent with one another" and "relate to the same subject matter." *Mitchell v. Witt*, 98 Va. 459, 461 (1900). When this is true, different statutes "should be construed together" even if

---

authorization for forced entry to execute pretrial detinue seizure was intentional when other statutes dealing with creditors' rights expressly authorized forcible entry).

"they contain no reference to one another, and were passed at different times." *Prillaman*, 199 Va. at 406 (quoting *Mitchell*, 98 Va. at 461).

While not an inflexible rule, the principal value of the "in pari materia" canon is to recognize that "apparent inconsistencies" can be and "should be ironed out whenever that is possible." *Commonwealth v. Sanderson,* 170 Va. 33, 38 (1938). Put another way, "[a] statute should be construed, where possible, with a view toward harmonizing it with other statutes." *Blue v. Virginia State Bar ex rel. First Dist. Comm.,* 222 Va. 357, 359 (1981). "If apparently conflicting statutes can be harmonized and effect given to both of them, they will be so construed." *Stafford Cnty. v. D.R. Horton, Inc.*, 299 Va. 567, 575 (2021) (citation omitted).

In some cases, the inconsistencies are quite real, not merely apparent, and thus cannot be "ironed out." *Sanderson,* 170 Va. at 38-39.[6] But the difference in language between Code § 15.2-1507(A)(10)(b)(3) and Code § 2.2-3003(E) is not one of those inconsistencies. When the General Assembly enacted the locality grievance statute, it underscored the modern salience of the in pari materia rule. The legislature warned localities that if they fail to provide an "immediate and fair method" for resolving grievances, Code § 15.2-1506, they will be "deemed to have adopted a grievance procedure that is consistent with" the state grievance procedure, Code § 15.2-1507(A) (citing Code § 2.2-3000 et seq.). That state grievance procedure requires a state government employer to timely provide a grievant, upon request, with "all documents . . . relating to the actions grieved." Code § 2.2-3003(E). Code § 15.2-1507(A)(10)(b)(3) is not nearly as broad but is still harmonious with Code § 2.2-3003(E) because both statutes provide a

---

[6] *See, e.g.*, *Lillard v. Fairfax Cnty. Airport Auth.*, 208 Va. 8, 13 (1967); *City of Richmond v. Board of Supervisors of Henrico Cnty.*, 199 Va. 679, 685 (1958); *Fairfax Cnty. v. City of Alexandria*, 193 Va. 82, 92 (1951); *Gaskill v. Commonwealth*, 185 Va. 440, 443-44 (1946); *Board of Supervisors of Henrico Cnty. v. Commonwealth ex rel. City of Petersburg*, 116 Va. 311, 313 (1914); *Justice v. Commonwealth*, 81 Va. 209, 211 (1885).

grievant with some measure of fair access to relevant documents necessary to mount a defense to the government employer's accusations.

To be clear, my view does not equate these two different provisions or treat the lesser as synonymous with the greater. Instead, it harmonizes the different language in both grievance statutes by focusing on the shared policy of fairness underlying them. "Several acts in pari materia, and relating to the same subject are to be taken together, and compared in the construction of them, because they are considered as having one object in view, and as acting upon one system." 1 James Kent, Commentaries on American Law 433 (1826); *see also* Earl T. Crawford, The Construction of Statutes 433-34 (1940). In this way, the rule "rests on two sound principles: (1) that the body of the law should make sense and (2) that it is the responsibility of the courts, within the permissible meanings of the text, to make it so." Scalia & Garner, *supra*, at 252.

Guided by these principles, the literal text of the locality grievance statute, Code § 15.2-1507(A)(10)(b)(3), can easily be read consistently with the state grievance statute, Code § 2.2-3003(E). The underlying policy is clearly stated for both the state grievance statute and the locality grievance statute — the implementation of "an immediate and fair method" for resolving employment disputes. Code §§ 2.2-3000(A), 15.2-1506. To the extent that the wording differences between the two create "apparent inconsistencies," the differences can effortlessly be "ironed out" without doing any harm at all to the text of either. *See Sanderson*, 170 Va. at 38.

That cannot be said of the City's interpretation, however. Under the City's view, it can base a termination decision on written accusations by accusers anonymous to the employee and never make these written statements available to the fired employee. No textual or contextual symmetry exists between this view of the locality grievance statute and the parallel requirements

24

of fairness in the state grievance statute. The City's view, adopted by the majority, implies that the locality grievance statute and the state grievance statute are leges diversae — not in pari materia.

3.

Asserting what appears to be an appellate factual finding, which, if true, would constitute an alternative holding that would moot entirely our legal debate, the majority discredits the stated intention of Lt. Williamson's counsel to use the requested documents at the grievance hearing on the ground that he did not have sufficient knowledge of their existence and contents. *See ante* at 8.[7] This assertion, in my opinion, should play no role in our analysis.

To begin with, the City never made this assertion in the circuit court. At no point has the City ever claimed that Lt. Williamson's counsel did not know enough about the requested documents to justify his stated intention to use them at the grievance hearing. The City's entire argument (adopted as the majority's principal legal ruling) has been that it did not matter what Williamson's counsel knew or did not know about the documents, and they were not going to be produced because the City decided not to use them at the grievance hearing. The circuit court, therefore, was never asked to test the bona fides of counsel's stated intention — and I consider it

---

[7] The intended inference from this argument is that the City did not know how to respond because it "could not know which files the grievant intended to use." *Ante* at 8. But that is not what happened. The City answered Lt. Williamson's request for the documents by saying (I am paraphrasing here), "Yes, these documents exist, 17 pages of them, the very letters and written statements that you have requested and that we are purposefully withholding."

The majority ends its discussion on this point by concluding: "Therefore, the only workable interpretation of the 'intended to be used' language is that a locality is obligated to produce the documents that it intends to use," *ante* at 8, not the documents the grievant intends to use. That is quite a leap in logic. Why would the only "workable interpretation" of the statute be that no grievant could ever obtain an undisclosed document (even if he knew the document's author, date, title, and specific contents) because this one grievant, Lt. Williamson, in this one case did not have the same level of specific knowledge?

25

inappropriate for us to do so on appeal. Worse still, the City never made this assertion on appeal either on brief or during oral argument. Its first appearance in this case will be in the Court's opinion reversing the circuit court and entering final judgment in the City's favor.

Even if the issue were properly before us, I would reject the majority's factual finding that Lt. Williamson's counsel did not have sufficient knowledge of the documents or their contents, *see ante* at 8, to support his stated intention to use them at the grievance hearing. The record reveals that the City never filed any pleadings challenging the factual allegations in Lt. Williamson's mandamus petition, never requested an evidentiary hearing, and never objected to the court making a final ruling based upon the proffered uncontested facts. After the court explained its demurrer ruling from the bench, the court asked both counsel, "Our next steps?" J.A. at 63. In response, the City's counsel did not state any intention to file a responsive pleading contesting the proffered facts. *See* Rule 3:8(b) (stating that a defendant "must, unless the defendant has already done so, file an answer" after losing a demurrer argument). Instead, the City's counsel simply preserved for appeal her previous argument about the legal irrelevance of a grievant's intended use of the documents and then volunteered that the City was "certainly willing to submit the documents under seal." J.A. at 63.

In his mandamus petition, Lt. Williamson stated that the City "refused to produce the documents requested, notwithstanding the obvious relevance to the proceeding, and Lt. Williamson's stated intention to use those documents at the time of his grievance panel hearing." *Id.* at 8. Both Lt. Williamson and the City identified those "documents" as the 17 pages of "character letters" and "witness statements" that the City had refused to produce in response to Lt. Williamson's request. *See id.* at 13, 15. The City concedes that it relied on these documents as a basis for firing Lt. Williamson. *See* Oral Argument Audio at 2:48 to 3:00, 4:49 to 5:00,

11:32 to 11:37. The circuit court's final order directed the City to specifically produce the "17 pages" of documents that the City had wrongfully withheld. *Id.* at 71.[8] If this were a "fishing expedition" as the majority seems to think, *ante* at 8, the trawler left the harbor looking for 17 specific fish in an open sea and concededly caught each of them, only to now be told that it was a catch-and-release fishing trip.[9]

B.

The City argues in the alternative that even if Code § 15.2-1507(A)(10)(b)(3) required the City to provide the documents upon which it had based its termination decision, the circuit court erred in issuing a writ of mandamus to enforce that right. The City begins its argument by correctly reciting the strict rules governing writs of mandamus. *See* Appellant's Br. at 5-6. Mandamus is an extraordinary remedy that can only be issued to enforce a ministerial, not

---

[8] Lt. Williamson had already seen drafts of some of the letters. As noted earlier, sometime after he was fired, Lt. Williamson "came into possession of a series of draft letters, apparently written by Firefighter Williams, which reflect Williams'[s] efforts to undertake a letter-writing campaign to smear [his] reputation." J.A. at 5.

[9] At this stage of the analysis, the majority has sequenced from its principal holding (that a grievant has no right as a matter of law to any discovery of any City documents that he intends to use at trial) to what appears to be an alternative factual finding (even if such a right existed, Lt. Williamson did not have enough knowledge of the existence or contents of the documents to make a bona fide discovery request). In a footnote at the end of this sequence, the majority adds an additional "for the sake of argument" explanation. *Ante* at 9 n.2. If Lt. Williamson's understanding of the statute were correct, the majority reasons, future grievants might abuse this limited discovery process by asserting "one-way discovery requests, all under the guise that they 'intend to use' those documents at the grievance hearing." *Ante* at 9 n.2. I find this argument particularly unconvincing. If that fear were a legitimate reason for refusing to recognize this limited right to discovery, then, all the more so, it would be reason enough to shut down plenary discovery ubiquitously allowed in civil cases. By its very nature, the discovery process "has a significant potential for abuse." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34-36 (1984), *cited with approval in Shenandoah Publ'g House, Inc. v. Fanning*, 235 Va. 253, 260-62 (1988). Even so, "[m]any legal rights may be the subjects of abuse, but cannot be denied for that reason" because the mere "possibility of the abuse of a legal right affords no ground for its denial." *Guthrie v. Harkness*, 199 U.S. 148, 155-56 (1905). I thus reject the majority's view that because any right to a limited form of discovery under Code § 15.2-1507(A)(10)(b)(3) could be subject to abuse, the right should not exist at all for anyone, whether scrupulous or unscrupulous.

27

discretionary, duty. *See Howell v. McAuliffe*, 292 Va. 320, 351 (2016). Even when such a ministerial duty exists, the writ should not be issued if doing so would be contrary to "substantial justice" or "be harmful to the public interests." *Richmond-Greyhound Lines, Inc. v. Davis*, 200 Va. 147, 151-52 (1958). In addition, the writ "may not be used as a substitute or guise for an appeal," *In re Commonwealth*, 278 Va. 1, 14 (2009), and may not be issued when there are other adequate remedies at law, *Howell*, 292 Va. at 351 n.17.

After reciting these principles, the City focuses only on two arguments. First, the City argues that Code § 15.2-1507(A)(10)(b)(3) only requires the City to produce documents that it intends to use at the grievance hearing. Whether to use some documents but not others, the City continues, is a discretionary decision. At this stage of the argument, however, this is circular reasoning. If the City's interpretation of the statute were correct, then the City would have the discretion to use or not use any documents at the grievance hearing. If the City incorrectly interprets the statute, as the circuit court correctly concluded, then the City has no discretion at all and instead has a ministerial duty to provide all relevant documents intended to be used in the grievance proceeding.

Because I agree with the circuit court's interpretation, I too conclude that Code § 15.2-1507(A)(10)(b)(3) imposes a ministerial duty on the City. I see no grounds to suggest otherwise. The City concedes that it relied on the withheld documents as a basis for terminating Lt. Williamson's employment, and Williamson has asserted in his mandamus petition that he intended to use them for cross-examination purposes at the grievance hearing. Given that concession and Williamson's assertion, the City had no discretionary power to ignore the unqualified "shall" command in subsection (A)(10)(b)(3). "A ministerial act," we have often said, "is an act that one performs in obedience to a legal mandate and in a prescribed manner,

28

without regard to his own judgment as to the propriety of the act to be done." *Howell*, 292 Va. at 351 (citation omitted). The duty of disclosure in Code § 15.2-1507(A)(10)(b)(3), as the circuit court correctly interpreted it, does not invite the City to make its "own judgment as to the propriety of the act to be done," *Howell*, 292 Va. at 351.

In its second argument against the issuance of a writ of mandamus, the City pivots to public-policy concerns. The City claims an adverse ruling in this case will

> dampen the willingness of employees to come forward to make complaints or give statements about discriminatory behavior that they witness in the public workspace. Many employees, if not given the expectation of confidentiality, would not be willing to speak honestly about the behavior or comments of their supervisors or coworkers.

Appellant's Br. at 7. I do not dispute that this concern is real — but it proves too much. Exactly the same could be said of complaining witnesses in criminal cases or whistleblowers in civil cases. Yet no public policy invests the courts with carte blanche authority to anonymize these witnesses as the price for their testimony. And in most cases they face considerably more risk than co-workers complaining about each other to their employer.

In this case, the principal accuser (Williams, a former co-worker and subordinate) is known to Lt. Williamson. What he does not know is the specific allegations of racism that Williams has asserted against him in letters and statements to City officials and the EEO investigator. Nor does Lt. Williamson know the identity of others who have made similar accusations. All Lt. Williamson knows is that the City relied upon these letters and witness statements as a basis for firing him. *See* Oral Argument Audio at 2:48 to 3:00, 4:49 to 5:00, 11:32 to 11:37. In the hierarchy of public-policy concerns applicable to this case, the most important is the constitutional duty to provide fair "post-termination administrative procedures," *Loudermill*, 470 U.S. at 547-48, and the statutory duty to provide an "immediate and fair

29

method" for resolving grievances, Code § 15.2-1506.  It can hardly be contrary to "substantial justice" or "be harmful to the public interests," *Richmond-Greyhound Lines, Inc.*, 200 Va. at 151-52, to require the City to comply with these duties.[10]

III.

In sum, the statute provides that "the grievant and his attorney . . . shall be allowed access to and copies of all relevant files intended to be used in the grievance proceeding."  Code § 15.2-1507(A)(10)(b)(3).  In my opinion, the City's successful interpolation — ^*by the City, but not by the grievant*^ — is an invalid amendment to, not a valid interpretation of, the statute.

I respectfully dissent.

---

[10] The City's public-policy concern is wholly hypothetical in this case.  At no point during this grievance process, the circuit court proceeding, or on appeal has the City proffered that any attempts have been made by Lt. Williamson or anyone else to threaten, intimidate, or harass any informant that the City had previously relied upon to justify its decision to fire Lt. Williamson.  In an abundance of caution, the circuit court stated from the bench that the City's documents would "be placed under seal."  J.A. at 64.  To the extent that a safeguard was necessary, it sufficiently addresses the City's concerns.  I offer no opinion, however, on whether this precautionary measure was required or permitted.  *See generally Daily Press, LLC v. Commonwealth*, 301 Va. ___, ___, 878 S.E.2d 390, 398 (2022).